# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

Case No. 25-2598

## ICON PSG 1 FL, LLC,

Plaintiff-Appellee,

v.

## JENKINS COURT REALTY CO., L.P.,

Defendant-Appellant.

Appeal from the United States District Court for the
Eastern District of Pennsylvania, Docket No. 2:25-cv-00044-GAM

## BRIEF OF THE APPELLEE, ICON PSG 1 FL, LLC

Gleb Epelbaum, Esquire
Attorney ID No. 320904
KURTZ AND PARTNERS P.C.
Swedesford Park, Building Three
1265 Drummers Lane, Suite 120
Wayne, PA 19087
(610) 688-2855
gepelbaum@kurtzpartners.com
*Attorneys for Plaintiff/Appellee,*
*ICON PSG 1 FL, LLC*

## **CORPORATE DISCLOSURE STATEMENT**

Plaintiff/Appellee, ICON PSG 1, LLC, is a single-member limited liability company.  Its single member is not a corporation, and no publicly traded corporation owns ten percent (10%) or more of its stock.  There are no publicly owned corporations that are not parties to this appeal that have interest in the outcome of this litigation.

**TABLE OF CONTENTS**

I.    STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................1

II.   STATEMENT OF RELATED CASES AND PROCEEDINGS.................2

III.  STATEMENT OF THE CASE ................................................................2

   A. Factual Background ........................................................................2

      1.  The Loan ...................................................................................2

      2.  Borrower's Defaults .................................................................6

   B. Litigation Below .............................................................................7

      1.  The Complaint ..........................................................................7

      2.  The Receivership Proceedings .................................................8

      3.  Pulley's Involvement with the Property After the Entry of the
          Receivership Order ..................................................................10

      4.  Other Court Proceedings Involving Pulley.............................11

      5.  The District Court Default ......................................................15

      6.  Borrower's Motion to Set Aside Default and Permit Answer.............16

      7.  The District Court's Denial of the Default Set Aside Motion..............18

      8.  The Default Judgment.............................................................19

IV.  SUMMARY OF THE ARGUMENT.............................................................22

V.   ARGUMENT .................................................................................................23

   A. The District Court Did Not Err in Denying the Default Set Aside
      Motion and Keeping the District Court Default in Place.....................23

      1.  Standard of Review.................................................................23

      2.  The District Court Did Not Abuse Its Discretion Because It Carefully
          Considered the Required Factors and Correctly Determined That They
          Weighed in Favor of Keeping the District Court Default in Place........24

         a.  Borrower's Failure to Timely File an Answer to the Complaint Was
             Not Excusable ...................................................................24

         b.  Borrower Failed to Set Forth a Meritorious Defense in the Proposed
             Answer ...............................................................................30

c. No Alternative Sanctions to Keeping the District Court Default in Place Were Available ........................................................................35

**B. The District Court Did Not Err in Entering the Default Judgment for the Full Amount of Borrower's Indebtedness Under the Loan Agreement**........................................................................................37

1. Standard of Review.................................................................................37

2. The District Court Did Not Abuse Its Discretion in Not Considering the Amounts Held by the Receiver When It Calculated the Amount of the Default Judgment ........................................................................37

**VI. CONCLUSION** ..............................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Choice Hotels Int'l, Inc. v. Pennave Assocs., Inc.*,
192 F.R.D. 171 (E.D. Pa. 2000)............................................................ 24, 30, 31

*Duparquet Huot & Moneuse Co. v. Evans*,
297 U.S. 216 (1936).................................................................................37

*Emcasco Ins. Co. v. Sambrick*,
834 F.2d 71 (3d Cir. 1987) ......................................................................23

*Farnese v. Bagnasco*,
687 F.2d 761 (3d Cir. 1982) ....................................................................25

*Foy v. Dicks*,
146 F.R.D. 113 (E.D. Pa. 1993)...............................................................25

*Gross v. Stereo Component Sys., Inc.*,
700 F.2d 120 (3d Cir. 1983) ....................................................................24

*Hagarty v. William Akers, Jr. Co.*,
20 A.2d 317 (Pa. 1941).............................................................................34

*Norwest Bank Minnesota v. Blair Rd. Assocs., L.P.*,
252 F. Supp. 2d 86 (D.N.J. 2003).............................................................38

*Trachtman v. T. M. S. Realty & Fin. Servs.*,
393 F. Supp. 1342 (E.D. Pa. 1975)...........................................................30

*United States v. $55,518.05 in U.S. Currency*,
728 F.2d 192 (3d Cir. 1984) ............................................................... 23, 30

*Wells Fargo Bank N.A. v. Ashley Bus. Park LLC*,
548 F. App'x 791 (3d Cir. 2013) ..............................................................37

iv

**Rules**

Fed. R. Civ. P. 4 ........................................................................................ 15, 25

Fed. R. Civ. P. 55 ...................................................................................... 24, 25

## I.   <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

In the Brief for Appellant (the "<u>Appellant Brief</u>") filed by Defendant/Appellant, Jenkins Court Realty Co., L.P. ("<u>Borrower</u>"), Borrower lists the following three issues as subject to this appeal:

> 1.   Whether the District Court erred or abused its discretion in refusing to allow leave for Appellant, Jenkins Court Realty Co., L.P., to file an answer to the Complaint, and rather entered a default judgment against Appellant in the amount of $22,056,659.26"?
>
> . . .
>
> 2.   Whether the District Court erred or abused its discretion in granting the Receiver's Motion to Modify the Lease Agreements with respect to the Property?
>
> . . .
>
> 3.   Whether the District Court erred or abused its discretion in holding Appellant and its principal, Philip Pulley, in contempt?

*See* Appellant Brief at § 2.

The second and the third issue listed in the Appellant Brief pertain to the orders issued by the District Court in response to motions that were filed by Trigild IVL, LLC (the "<u>Receiver</u>")—the receiver for the Property (as defined below) appointed by the District Court.  Only the first issue identified in the Appellant Brief pertains to relief secured by Plaintiff/Appellee, ICON PSG FL 1, LLC ("<u>Lender</u>").  As such, this Brief will only deal with the first issue identified in the Appellant Brief, leaving the second and the third issue for the Received to address.

1

**II.      STATEMENT OF RELATED CASES AND PROCEEDINGS**

This case has not previously been before this Court.   Lender instituted confessed judgment proceedings against Borrower and its principal, Philip Pulley ("Pulley") in the Circuit Court for Baltimore, Maryland captioned *ICON PSG 1 FL, LLC v. Jenkins Court Realty Co., L.P., et al.*, No. C-03-CV-25-000263 (Md. Baltimore Cnty. Cir. Ct.) (the "Maryland Confessed Judgment Proceedings").   The judgment against Pulley secured in the Maryland Confessed Judgment Proceedings was recorded with (i) the Court of Common Pleas for Montgomery County, Pennsylvania in the matter captioned *ICON PSG 1 FL, LLC v. Philip Pulley*, Docket No. 2025-25715 (Pa. Com. Pl., Montgomery Cnty.); and (ii) the Circuit Court for the 17th Judicial Circuit in and for Broward County, Florida captioned *ICON PSG 1 FL, LLC v. Philip Pulley a/k/a Charles Pulley*, Case No. CACE25006869 (Fla. Cir. Ct., Broward Cnty.).

**III.     STATEMENT OF THE CASE**

**A. Factual Background**

1. The Loan

Lender made a loan to Borrower in the principal amount of $20,500,000.00 (the "Loan") for the purpose of refinancing the then-existing debt on the Property (as defined below) and funding certain construction projects at the Property

2

(collectively, the "Projects"). Appx3.[1] The Loan was memorialized by way of, *inter alia*, that certain Loan Agreement by and between Lender and Borrower dated September 27, 2023 (the "Loan Agreement" and, collectively with the Mortgage (as defined below) and certain other documents executed in conjunction with the Loan, the "Loan Documents"). Appx29–95.

To secure its obligations under the Loan Documents, Borrower executed that certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated September 22, 2023 (the "Mortgage") in favor of Lender. Appx104–148. The Mortgage encumbers certain commercial real property with the street address of 610 Old York Road, Jenkintown Borough, Montgomery County, Pennsylvania, Parcel ID # 10-00-05364-00-8, more particularly described in Exhibit A to the Mortgage (the "Property"). Appx138.

Section 2.3 of the Loan Agreement required Borrower to, *inter alia*, make monthly interest payments, in arrears, on the first of each calendar month. App. 46. Per Section 2.3.4 of the Loan Agreement, Borrower was obligated to make all such payments "without counterclaim or setoff." Appx47. According to Section 11.2.2

---

[1] Notwithstanding Borrower's designation of the appendix filed by Borrower in this appeal as a "Joint Appendix," counsel for Borrower never contacted Lender's counsel to coordinate what would need to be included in such "Joint Appendix." As such, certain portions of the record below necessary for this Court's disposition of this appeal are missing from the "Joint Appendix" filed by Borrower. To address this, Lender is filing a supplemental appendix with this Brief that includes the portions missing from the "Joint Appendix" filed by Borrower.

of the Loan Agreement, failure to make any such monthly payment within five days of the date on which it is due (*i.e.*, by the sixth of the applicable calendar month), without requirement of any notice from Lender, constitutes an "Event of Default." Appx47.

Section 2.3.3 of the Loan Agreement authorize Lender to, *inter alia*, (i) assess late fees on any periodic monthly payment that is not received by Lender within ten days of the date on which it is due, and (ii) assess interest at a Default Rate (as the term is defined in the Loan Agreement) upon occurrence of any Event of Default. Appx46–47. Furthermore, Section 9.14 of the Loan Agreement authorizes Lender to assess against and collect from Borrower any and all costs, including attorneys' fees, incurred by Lender in enforcement of its rights under the Loan Documents. Appx68.

Upon occurrence of an Event of Default, Section 11.3.1 of the Loan Agreement authorizes Lender to, *inter alia*, immediately accelerate or declare all obligations under the Loan Documents to become due and payable, including, without limitations, the entire principal of the Loan, all unpaid interest, and all other charges due to Lender under the Loan Documents. Appx75. Section 7.1(g) of the Mortgage expressly authorizes the appointment of a receiver for the Property upon the occurrence of an Event of Default. Appx121.

With respect to the portion of the Loan that was to be disbursed to Borrower for the Projects, Section 6.2 of the Loan Agreement expressly conditions such disbursement on Borrower's full compliance with the terms of the Loan Agreement and there being "[n]o Default or Even of Default" under the Loan Agreement. Appx52. Section 11.1 of the Loan Agreement defines "Default" as any noncompliance by Borrower with the terms of the Loan Documents, even if such noncompliance does not become an "Event of Default" until there is a notice of such non-compliance and/or failure to cure by Borrower. Appx73.

With respect to Lender's obligations under the Loan Documents, Section 15.8.1 of the Loan Agreement expressly states as follows:

> Lender shall not be in default under this [Loan] Agreement, or under any other Loan Document, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within thirty (30) days after Borrower first had actual knowledge or actual notice of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, with reasonable promptness thereafter. Such actual knowledge or actual notice shall refer to what was actually known by, or expressed in a written notification furnished to, any of the persons or officials referred to in Exhibit B as Authorized Representatives or of the [Property] Manager.

Appx81.

5

2. <u>Borrower's Defaults</u>

Between December 2023 and October 2024, Borrower failed to make the monthly payments required under the Loan Documents within the five-day grace period set forth in the Loan Agreement. Appx174.   Furthermore, Borrower completely failed and refused to pay the monthly payments that were due under the Loan Documents on November 1, 2024, December 1, 2024, and January 1, 2025. Appx174.  Each such late payment and non-payment constitutes an Event of Default under Section 11.2.2 of the Loan Documents. Appx75.

By way of the letter dated December 3, 2024 from Lender's counsel to Borrower (the "<u>Acceleration Notice</u>"), Lender declared the full amount of the Loan, together with all other amounts due under the Loan Documents, due and payable, demanding that all such amounts are paid to Lender no later than December 13, 2024. Appx150–152.  Borrower failed and refused to pay any portion of the amounts set forth in the Acceleration Notice, which failure also constitutes an Event of Default under Section 11.2.3 of the Loan Agreement. Appx75, 175.

Borrower's other Default's under the Loan Agreement included (i) failure to pay property and school taxes for the Property for 2024, as required under Section 9.3 of the Loan Agreement; and (ii) repeated failure to provide Lender with financial reporting, as required under Section 9.2 of the Loan Agreement. Appx62–64, Appx175.

**B. Litigation Below**

1. The Complaint

Lender commenced the foreclosure action below by way of the Complaint that was filed on January 6, 2025. Appx21–155.  In the Complaint, Lender sought a foreclosure judgment for the full principal amount of the Loan, together with the then-accrued interest, fees, and expenses, less the undisbursed Project-related Loan amounts (the "Construction Escrow Balance"):

| | |
|---|---|
| Unpaid Principal: | $20,500,000.00 |
| Accrued Interest: | $1,408,741.66 |
| Fees and Expenses: | $41,122.36 |
| *Less Construction Escrow Balance:* | *($1,493,052.88)* |
| **Total Due:** | **$20,456,811.14** |

Appx26–27.

The Summons was issued by the District Court on January 6, 2025. Appx14. Copies of the Complaint, the Summons, the Notice of a Lawsuit and Request to Waive Service of a Summons, and the Waiver of the Service of Summons (collectively, the "Waiver Documents") were sent to Michael Yanoff, Esquire ("Attorney Yanoff") of the law firm Goldstein Law Partners, LLC (the "Goldstein Firm")—counsel of record for Borrower—on January 9, 2025. Appx433, Appx436–

437. Attorney Yanoff executed the Waiver of the Service of Summons on behalf of Borrower, which was then filed on January 15, 2025. SAppx001–002.[2]

### 2. The Receivership Proceedings

On January 10, 2025, Lender filed the Motion for Expedited Appointment of a Receiver (the "Receivership Motion"). Appx158–322.  On January 13, 2025, via email, Attorney Yanoff requested an extension of time for Borrower to file a response to the Receivership Motion due to his then-upcoming travel. Appx436.  In his emails, Attorney Yanoff did not (i) request an extension of the deadline for Borrower to file a response to the Complaint, or (ii) set forth any other reason for requesting an extension of time for Borrower to file an opposition to the Receivership Motion. Appx436.  Lender agreed to a seven-day extension for Borrower to file the opposition to the Receivership Motion. Appx323, 436.

On January 31, 2025, (i) Shawn M. Rodgers, Esquire (also of the Goldstein Firm) entered his appearance on behalf of Borrower; and (ii) Borrower filed Defendant's Response in Opposition to Plaintiff's Motion for Expedited Appointment of a Receiver (the "Receivership Motion Opposition Brief"). Appx14, Appx324–348.  In the Receivership Motion Opposition Brief, Borrower attempted to oppose the Receivership Motion based on, *inter alia*, allegations that Lender

---

[2] *See* n.1 *supra.*

purportedly breached the Loan Documents by allegedly not disbursing certain Project-related funds to Borrower, which purported breaches somehow caused the Events of Default set forth in the Complaint and the Receivership Motion. Appx338–340.

On February 21, 2025, the District Court issued a Memorandum, granting the Receivership Motion. Appx379–386.  In the Memorandum, the District Court held that, *inter alia*, (i) "notice of the breach to [Lender] within 30 days of any alleged noncompliance . . . [was] a prerequisite to establishing breach [by Lender] under the [Loan] Agreement"; and (ii) Borrower failed to provide any evidence that any such notice was ever provided to Lender (or, for that matter, that Lender did anything to breach the Loan Agreement in the first place). Appx383–385.

The District Court issued the Order dated February 21, 2025 (the "Receivership Order"), appointing the Receiver as the receiver for the Property. SAppx003–016.  The Receivership Order, *inter alia*, directed the Receiver to (i) take control of the Property; (ii) collect all revenues and rents from the Property; (iii) deposit all such collected revenues and rents in a segregated account; (iv) perform Property-related construction projects; (v) retain personnel, contractors, and professionals necessary for the operation of the Property; and (vi) incur and pay expenses associated with all Property operations. SAppx003–016.  The Receivership Order contemplates ongoing oversight by the District Court, requires that

9

distributions of proceeds from Property sale have to be approved by the District Court, and states that the receivership would continue even after the entry of the final judgment. SAppx003–016.

### 3. Pulley's Involvement with the Property After the Entry of the Receivership Order

Prior to the District Court's entry of the Receivership Order, the Property was managed by SBG Management Services PA Inc. (the "Property Manager"). Appx174. Pulley is the principal of both Borrower and the Property Manager. Appx174. Beginning on February 25, 2025 (*i.e.*, shortly after the District Court's entry of the Receivership Order), Pulley sent numerous emails to representatives of the Receiver regarding the transition of Property operations from Borrower and/or the Property Manager to the Receiver (collectively, the "Pulley Emails"). Appx434, Appx439–614. None of the Pulley Emails mention or indicate that Pulley was dealing with any type of health issues at the time. Appx439–614. On the contrary, the Pulley Emails show that, during the entire two-week period during which the Pulley Emails were sent, Pulley was aware of, actively involved in, and ready, willing, and able to deal with the day-to-day operations of the Property. Appx439–614.

The Pulley Emails were sent by Pulley to representatives of the Receiver in response to their repeated requests for documentation and information necessary for

10

the Receiver to take over the operation of the Property, as required by the Receivership Order. Appx439–614.  Per the Pulley Emails, not only was Pulley refusing to provide the Receiver with such information and documentation, he was making demands on the Receiver to provide information and documentation to Pulley pertaining to the Property. Appx439–614.  After the Receiver's repeated and unsuccessful attempts to obtain Property-related information and documentation from Borrower, the Receiver had to file with the District Court (i) a Motion to Compel Defendant's Compliance with Receiver Order, and (ii) a Motion to Hold Defendant and Its Principal in Contempt of the Court's Compliance Order (collectively, the "Borrower Noncompliance Motions"). Appx406–407, Appx1196–1212.  The District Court granted both Borrower Noncompliance Motions. Appx1–5, Appx748–749.

    4.  Other Court Proceedings Involving Pulley

Concurrently with the litigation below, Pulley and numerous entities owned and/or controlled by Pulley were involved in multiple other civil and criminal proceedings:

1. Ten different entities owned and/or controlled by Pulley were involved in foreclosure proceedings instituted by Fannie Mae with the United States District Court for the Eastern District of Pennsylvania captioned *Fannie*

*Mae v. Harrison Court Realty Co., L.P., et al.*, No. 2:24-cv-04722-CMR (E.D. Pa.) (the "Fannie Mae Foreclosure").

2. Several other entities, as well as Pulley individually, were involved in litigation brought by the Commonwealth of Pennsylvania in the Court of Common Pleas for Philadelphia County, Pennsylvania captioned *Commonwealth of Pennsylvania v. Cresheim Valley Realty Co., L.P., et al.*, No. 230701198 (Pa. Com. Pl. Phila. Cnty. Ct.) (the "Philadelphia County Litigation"). Attorney Yanoff represented Pulley and his companies in the Philadelphia County Litigation.

3. Borrower, the Property Manager, and Pulley individually were involved in a collection action filed by a provider of scaffolding equipment at the Property in the Court of Common Pleas for Montgomery County, Pennsylvania captioned *Superior Scaffold Services, Inc. v. SBG Management Services, Inc., et al.*, No. 2025-00055 (Pa. Com. Pl. Montgomery Cnty. Ct.) (the "Montgomery County Litigation"). Attorney Yanoff likewise represented Pulley and his companies in the Montgomery County Litigation.

4. Pulley was involved in criminal proceedings before the Honorable Mitchell Goldberg in the United States District Court for the Eastern District of Pennsylvania captioned *United States of America v. Philip C.*

12

*Pulley*, No. 2:24-cr-00288-MSG (E.D. Pa.) (the "Pulley Criminal Proceedings"), wherein Pulley pled guilty to charges of voter fraud and several related offenses.

5. Lender instituted the Maryland Confessed Judgment Proceedings against Borrower and Pulley in the Circuit Court for Baltimore, Maryland. Appx416–417, Appx622–649.

Between January 9, 2025 and March 13, 2025, numerous filings were made on behalf of Pulley and Pulley-controlled defendants in the Fannie Mae Foreclosure, the Philadelphia County Litigation, the Montgomery County Litigation, and the Pulley Criminal Proceedings:

***Fannie Mae Foreclosure:***

- A stipulation to extend time for the defendants to file a response to Fannie Mae's motion to amend the receivership order, filed on February 13, 2025.

- A stipulation to extend time for the defendants to file an answer to the amended complaint, filed on February 13, 2025.

- A stipulation to extend case management deadlines, filed on February 19, 2025.

- The defendants' response to the motion to amend the receivership order, filed February 26, 2025.

13

- The defendants' answer to the amended complaint, filed February 27, 2025.

*Philadelphia County Litigation:*

- An appeal to the Pennsylvania Superior Court, filed January 16, 2025.

- A praecipe to attach an affidavit, filed February 5, 2025.

- A statement of matters complained of on appeal, filed February 17, 2025.

*Montgomery County Litigation:*

- Preliminary Objections filed on behalf of all defendants, including Borrower, the Property Manager, and Pulley, filed on February 17, 2025 (the "Montgomery County Litigation POs").  The Montgomery County Litigation POs included a verification signed by Pulley, with Pulley stating that all statements made in the Montgomery County Litigation POs were true to the best of his knowledge, information, and belief.

*Pulley Criminal Proceedings:*

- Motion for Release of Passport, filed by Pulley *pro se* on January 10, 2025.

- Motion to Permit Travel Outside the United States, filed on January 23, 2025 (this time through an attorney), seeking permission for Pulley

to travel to the Galapagos Islands and Ecuador from May 13, 2025 until May 25, 2025 (the "Pulley Travel Motion"). Appx417–418, Appx650–678.

Furthermore, on March 25, 2025, the confessed judgment paperwork filed in the Maryland Confessed Judgment Proceedings was personally served on Pulley at his Florida residence. Appx434, Appx678–679. Per the Affidavit of Service prepared by the process server, (i) an individual working outside Pulley's Florida residence advised the process server that Pulley was inside and identified Pulley through the window; (ii) Pulley answered the door and confirmed his identity; and (iii) once the process server advised Pulley as to who he was and the purpose of the visit, Pulley then told the process server that Pulley was merely a tenant and shut the door. Appx679.

### 5. The District Court Default

At no point did Attorney Yanoff or any other counsel for Borrower request an extension of time to file a response to the Complaint. Appx433. Because Borrower failed to file an answer to, or otherwise move with respect to, the Complaint within the time permitted under the applicable rules (*i.e.,* March 10, 2025),[3] Lender filed a

---

[3] *See* Fed. R. Civ. P. 4(d)(3) ("A defendant who, before being served with process, timely returns a waiver need not serve an answer to the complaint until 60 days after the request was sent . . . .").

Request for Entry of Default on March 12, 2025. Appx387–390.  On March 13, 2025, the Clerk of Court entered a default against Borrower (the "District Court Default"). Appx391.

### 6.  Borrower's Motion to Set Aside Default and Permit Answer

On March 13, 2025, Borrower filed the Motion to Set Aside Default and Permit Answer (the "Default Set Aside Motion"). Appx392–400.  The Default Set Aside Motion was filed on behalf of Borrower by Albert A. Ciardi III, Esquire of the law firm Ciardi Ciardi & Astin, P.C. Appx392–400.

The Default Set Aside Motion did not question the timing as to when the Waiver Documents were sent to Attorney Yanoff or the timeliness of Lender's filing of the Request for Entry of Default. Appx392–393.  Nor did the Default Set Aside Motion allege that any requests for extension for Borrower to file a response to the Complaint were requested or granted. Appx392–393.  Instead, the Default Set Aside Motion alleged (for the first time) that Borrower was purportedly unable to prepare and file a response to the Complaint during the eight-week period between the date on which the Waiver Documents were provided to Attorney Yanoff and the entry of the District Court Default because Pulley was allegedly in the hospital for six of those weeks and was therefore purportedly "unable to assist counsel." Appx392–393.

Attached to the Default Set Aside Motion as an exhibit was an Answer and Affirmative Defenses to Complaint in Mortgage Foreclosure that Borrower intended to file in the event the District Court Default was set aside (the "Proposed Answer"). Appx395–398. The three-page Proposed Answer was comprised of conclusory admissions, denials, and non-responses. Appx396–398. Of the four affirmative defenses set forth in the Proposed Answer, the only substantive defense was based on vague and conclusory allegations that "Plaintiff breached its obligations as follows: (a) Failure to approve tenants; (b) Interference with leasing and construction; (c) Failure to approve or fund construction work for the Property; (d) Failure to approve sales of the property; and, [sic] (e) Failure to fund draws or fund draws timely." Appx398.

On March 28, 2025—*i.e.*, more than two weeks after the Default Set Aside Motion was filed—Borrower filed the Affidavit of Philip Pulley (the "Pulley Default Affidavit"). Appx401–404. The Pulley Default Affidavit—which was filed by Borrower in support of the Default Set Aside Motion—alleged that Pulley purportedly (i) underwent several surgeries and "bedside procedures" between January 7, 2025 and March 13, 2025; and (ii) took antibiotics and pain medication. Appx401–403. The Pulley Default Affidavit did not allege that Pulley was so incapacitated during the eight-week period between January 9, 2025 (the date on which the Waiver Documents were sent to Attorney Yanoff) and March 13, 2025

17

(the date on which the District Court Default was entered) as to be unable to assist his attorneys in preparing the three-page Proposed Answer. Appx401–403.

### 7. The District Court's Denial of the Default Set Aside Motion

On May 2, 2025, the District Court entered an Order denying the Default Set Aside Motion. Appx692. In the accompanying Memorandum,[4] the District Court carefully considered the factors that this Court requires a district court to consider prior to deciding whether or not a default should be set aside. Appx686–690.

The District Court held that Borrower failed to demonstrate excusable neglect with respect to its failure to file a timely response to the Complaint because (i) Borrower was represented by counsel during the entirety of the proceedings, (ii) Borrower vigorously opposed the appointment of the Receiver, (iii) Pulley was healthy enough to be involved in the operation of the Property as well as the other court proceedings in which he and his various entities were involved. Appx687–688.

The District Court went on to review the defenses that Borrower sought to assert in the Proposed Answer. Appx688–690. The District Court held that the only non-boilerplate defense set forth in the Proposed Answer—*i.e.*, Lender's purported "breaches" of the Loan Agreement—failed as a matter of law and, therefore, did not constitute a meritorious defense. Appx689–690. The basis for the District Court's

---

[4] Appx683–690.

rejection of this defense was the same as it was in the context of the Receivership Motion: Borrower failed to allege or provide any evidence that any notice to Lender required under the Loan Agreement was ever provided (which notice was necessary to establish Lender's breach of the Loan Agreement). Appx689–690.

Finally, the District Court held that there was no appropriate alternative relief to keeping the District Court Default in place because "[n]o purpose is served by vacating a default where no meritorious defenses exist, . . . where no underlying facts are likely to emerge supporting a potential defense[, and] [s]etting aside default here would only multiply costly litigation." Appx690.

### 8.  The Default Judgment

On May 27, 2025, Lender filed the Request for Entry of Default Judgment (the "Default Judgment Request"), seeking an entry of default judgment by the Clerk in the amount of $22,056,659.26 (together with post-judgment interest). Appx991–1001.  In support of the requested judgement amount, Lender submitted, *inter alia*, the Declaration of Cameron Lawson in Support of the Request for Entry of Default Judgment (the "Lawson Declaration"). Appx995–999.  The Lawson Declaration provided detailed calculation of the requested judgment amount. Appx996–999.  The amount of the requested default judgment was comprised of the amount sought in the Complaint (*i.e.*, $20,456,811.14), plus additional $1,599,848.12 in interest that had accrued between the date of the Complaint (January 6, 2025) and the date on

19

which the Default Judgment Request was filed (May 27, 2025) at the Default Rate set forth in the Loan Agreement. Appx999.  As set forth in the Lawson Declaration, at the time of filing of the Default Judgment Request, no portion of the amounts due under the Loan Agreement had been paid to Lender. Appx997.

On June 24, 2025, the District Court issued an Order, scheduling a hearing on, *inter alia*, Lender's Default Judgment Request for July 1, 2025. Appx1370.  On the eve of the scheduled hearing, Borrower filed the Declaration of Phillip Pulley on Behalf of Jenkins Court Realty Co., LP (the "Pulley Default Judgment Declaration"). Appx1371–1377.  In the Pulley Default Judgment Declaration, Borrower (i) challenged the default interest calculations set forth in the Lawson Declaration, and (ii) demanded that the judgment against Borrower is reduced by the amount of rents that was held by the Receiver. Appx1371–1373.

At the hearing,[5] Borrower's counsel renewed Borrower's (i) challenges to Lender's calculations of the amounts set forth in the Default Judgment Request, and (ii) demand that the judgment amount is reduced by the rent amounts that were held by the Receiver. SAppx024–028 [Tr. 8:23–12:1], SAppx031 [Tr. 15:10–17]. Borrower's counsel also appeared to take the position that the amount sought in the Default Judgment Request did not account for the Construction Escrow Balance. SAppx029–032 [Tr. 13:4–16:10].

---

[5] *See* SAppx017–066 for the transcript of the July 1, 2025 hearing.

Lender's counsel addressed all of the issues raised by Borrower's counsel. SAppx022–024 [Tr. 6:4–8:20], SAppx028–031 [Tr. 12:7–15:7]. Lender's counsel explained the interest calculations based on the timing, the applicable rate, and the Events of Default. SAppx022 [Tr. 6:4–22], SAppx029–030 [Tr. 13:21–14:15]. With respect to the Construction Escrow Balance, Lender's counsel pointed out that both the Complaint and the Default Judgment Request expressly backed that amount out of the calculations of the amounts due. SAppx030–031 [Tr. 14:18–15:1].

With respect to the rent amounts held by the Receiver, Lender's counsel argued that the default judgment should not be reduced by those amounts because (i) the Receiver would continue to operate the Property, collect revenues, and pay expenses even after the default judgment is entered; and (ii) the necessary adjustments would still need to be made upon the final disposition of the Property and the Receiver's submission of final accounting. SAppx023–024 [Tr. 7:2–8:20].

On July 18, 2025, the District Court entered the Order, granting the Default Judgment Request in the amount of $22,056,659.26 (the "Default Judgment Order"). Appx6. The Default Judgment Order explicitly states that "[a]ny credits and offsets shall be appropriate for resolution at a later stage of this litigation." Appx6.

## IV.    SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion in denying the Default Set Aside Motion.  The District Court carefully considered each factor mandated by this Court in determining whether good cause existed for setting aside the District Court Default.  The District Court correctly determined that (i) Borrower's failure to file a timely response to the Complaint was not excusable, (ii) Borrower failed to assert a meritorious defense, and (iii) no alternatives to keeping the District Court Default in place were available.  With respect to the meritorious defense factor (the only one that Borrower appears to challenge in this appeal), the District Court correctly determined that no meritorious defense existed because, even after the District Court brought to Borrower's attention the contractual notice requirements necessary to establish Lender's breach, Borrower failed to adduce any evidence thereof.

The District Court also did not abuse its discretion when it did not factor any amounts held by the Receiver into the calculations of the Default Judgment Order amount.  Taking the rents held by the receiver into consideration at the time when the Default Judgment Order was issued would have been inconsistent with both the Receivership Order and the applicable legal precedent.  Furthermore, the Default Judgment Order expressly contemplates potential need for further adjustments to the amount set forth in the Default Judgment Order.

22

## V.   **ARGUMENT**

### A. The District Court Did Not Err in Denying the Default Set Aside Motion and Keeping the District Court Default in Place

#### 1.  Standard of Review

This Court reviews a district court's decision as to whether a default should be set aside for abuse of discretion. *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 73 (3d Cir. 1987); *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984).  In determining whether the district court abused its discretion, this Court focuses on whether the district court considered the following factors: "(1) whether lifting the default would prejudice the plaintiff; (2) whether the defendant has a *prima facie* meritorious defense; (3) whether the defaulting defendant's conduct is excusable or culpable; and (4) the effectiveness of alternative sanctions." *Emcasco Ins. Co.*, 834 F.2d at 73. *See also 55,518.05 in U.S. Currency*, 728 F.2d at 195 ("Nevertheless, we do not set aside the entry of default and default judgment unless we determine that the district court abused its discretion. We require the district court to consider the following factors in exercising its discretion in granting or denying a motion to set aside a default under Rule 55(c) or a default judgment under Rule 60(b)(1): (1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; (3) whether the default was the result of the defendant's culpable conduct.").

2. <u>The District Court Did Not Abuse Its Discretion Because It Carefully Considered the Required Factors and Correctly Determined That They Weighed in Favor of Keeping the District Court Default in Place</u>

In the District Court's Memorandum supporting its denial of the Default Set Aside Motion, the District Court considered all four factors promulgated by this Court. Appx686–690. It then determined that three of those factors favored keeping the District Court Default in place. Appx686–690. As set forth below, the District Court's determination with respect to each factor was correct, and, as such, the District Court did not abuse its discretion in denying the Default Set Aside Motion.

a. *Borrower's Failure to Timely File an Answer to the Complaint Was Not Excusable*

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Once entered, a default may only be set aside "for good cause." Fed. R. Civ. P. 55(c).

When the default is entered due to a party's culpable conduct (as opposed to excusable neglect), the default should not be set aside. *See Choice Hotels Int'l, Inc. v. Pennave Assocs., Inc.*, 192 F.R.D. 171, 174 (E.D. Pa. 2000) ("Next, I must determine whether Miller's failure to answer Choice's complaint was the result of culpable conduct. Culpable conduct means 'actions taken willfully or in bad faith.'") (citing *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 124 (3d Cir. 1983))

24

(internal citation omitted); *Foy v. Dicks*, 146 F.R.D. 113, 117 (E.D. Pa. 1993) ("In this context, 'culpable conduct means actions taken willfully or in bad faith.'"). The defaulting party's bad-faith conduct—before or after a default is entered—can "provide the basis for refusing to set aside a default." *Farnese v. Bagnasco*, 687 F.2d 761, 765 (3d Cir. 1982).

Copies of the Waiver Documents were sent to Attorney Yanoff on January 9, 2025. Appx433, Appx436–437.  As such, Borrower had until March 10, 2025 to file an answer or otherwise respond to the Complaint. Fed. R. Civ. P. 4(d)(3).  At no point did any of Borrower's three attorneys from two different law firms request an extension of this deadline. Appx433.  Because Borrower failed to file an answer to or otherwise move with respect to the Complaint prior to March 10, 2025, Lender sought and obtained the District Court Default, as authorized under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default.").

The sole reason provided by Borrower in the Default Set Aside Motion as to why Borrower failed to file a timely response to the Complaint within the generous sixty-day period afforded by the Federal Rules of Civil Procedure was that Pulley's purported health issues allegedly made him "unable to assist counsel" in preparing

25

the three-page formulaic Proposed Answer. Appx392–393.  The overwhelming evidence regarding Pulley's actions during such period, however, thoroughly contradicts such allegation.

During the entire sixty-day period in question, Pulley and his companies were very active in no fewer than five different court proceedings (including the litigation below), in which they made no fewer than twelve separate filings during that very same time period. Appx416–417, Appx622–678.  Borrower vigorously contested the Receivership Motion, which certainly involved at least some input from Pulley. Appx324–348.  In fact, many of the grounds on which Borrower opposed the Receivership Motion were the very same "defenses" that Borrower sought to assert in the Proposed Answer—*i.e.*, allegations that Lender "breached" the Loan Agreement by purportedly, *inter alia*, not disbursing certain Project-related funds to Borrower. Appx338–340.  It was completely disingenuous for Borrower to allege that Pulley was "unable to assist counsel" in preparing the Proposed Answer, yet have no problem litigating the very same "defenses" in the context of the Receivership Motion.

The amount of activity by Pulley and the various Pulley-controlled entities in the other four court proceedings further refutes any allegations that Pulley was purportedly too sick to assist Borrower's counsel in preparing the Proposed Answer. On January 23, 2025, Pulley filed a motion in the Pulley Criminal Proceedings to

permit him to travel to the Galapagos Islands and Ecuador in May 2025. Appx675–677. Three weeks later, stipulations were filed in the Fannie Mae Foreclosure to extend time for the Pulley-controlled defendants to respond to Fannie Mae's motion to amend the receivership order and the amended complaint. Appx620. The very next week, (i) a statement of matters complained of on appeal was filed on behalf of Pulley and the other defendants controlled by Pulley in the Philadelphia County Litigation (where Pulley and his various companies are represented by the very same counsel who represented Borrower in the litigation below); and (ii) the Montgomery County Litigation POs were filed on behalf of Pulley, Borrower, and the Property Manager in the Montgomery County Litigation. Appx642, Appx651–673. Pulley himself reviewed and signed the Montgomery County Litigation POs. Appx661. Ten days later, Pulley-controlled defendants filed an opposition to Fannie Mae's motion to amend the receivership order and an answer to Fannie Mae's amended complaint. Appx620.

Furthermore, Borrower's allegations that Pulley was allegedly "unable to assist counsel" in preparing the Proposed Answer due to his purported health problems are further contradicted by the flurry of Pulley Emails that immediately followed the Receivership Order. Between February 25, 2025, and the entry of the Default, Pulley sent the Receiver's representatives numerous Pulley Emails, usually several times per day. Appx439–614. Not only do the Pulley emails show that Pulley

27

was well enough to communicate with other parties, they show that he was very much aware of, actively involved in, and ready, willing, and able to deal with the day-to-day operations of the Property. Appx439–614.

In the District Court's Memorandum denying the Default Set Aside Judgment, the District Court makes it clear that it carefully considered all of the aforementioned activities involving Pulley in determining that Borrower could not establish excusable neglect:

> Defendant has been represented by Counsel in this suit since at least mid-January, 2025, when Defendant's counsel waived service. Even if Mr. Pulley were extremely ill, counsel could have responded to the Complaint with minimal involvement from him, or at a minimum sought an extension based on incapacity. But at no point was there any response to the Complaint. Strikingly, the first assertion of incapacity was not raised until *after* Default had already been entered. The failure to respond to the Complaint even as Defendant vigorously contested appointment of a receiver can only be viewed as willful.
>
> . . .
>
> Plaintiff has convincingly demonstrated that despite Mr. Pulley's contention that he was too ill to file an answer in the sixty days between service of the waiver request and Default, he zealously litigated not only the receivership here but other matters during that same period. For example, in the relevant period, Pulley and his entities made no fewer than twelve separate filings in five different civil and criminal dockets. Pulley also sent Trigild representatives numerous emails about the property management transition, often several times a day. Even if Pulley was intermittently hospitalized and incapacitated, he has nevertheless remained intimately involved in the day-to-day operation of his property, again undercutting the likelihood that he was too ill to respond to the Complaint in the period at issue.

28

> Further, although Pulley represents in his affidavit that he was hospitalized and underwent several surgeries and "bedside procedures" requiring pain medication and antibiotics, he does not at any point allege true incapacity that would have hindered his ability to cooperate with his attorney's preparation of a brief answer or request for an extension.
>
> Despite representations about illness, I am not persuaded that Mr. Pulley was unable to help his attorneys submit a short responsive filing as required under the Federal Rules. This is especially so against the backdrop of his active involvement in both the receivership transition in this case and in his other legal proceedings. Defendant fails to establish good cause to vacate the default.

Appx687–688.  As such, the District Court correctly determined that Borrower's failure to file a timely response to the Complaint was willful, not excusable.[6]  The correctness of such determination is further underscored by the fact that, in the Appellant Brief, Borrower does not challenge this determination by the District Court, focusing instead on the argument that Borrower purportedly set forth a meritorious defense in the Proposed Answer.  Such argument, however, fails for the reasons set forth below.

---

[6] While the Memorandum does not address Pulley's repeated refusal to cooperate with the Receiver and attempts to evade service in the Confessed Judgment Proceedings, such bad faith conduct by Pulley further weighed in favor of keeping the District Court Default in place.

29

b. *Borrower Failed to Set Forth a Meritorious Defense in the Proposed Answer*

"The showing of a meritorious defense is a prerequisite to the setting aside of a default." *Trachtman v. T. M. S. Realty & Fin. Servs.*, 393 F. Supp. 1342, 1347 (E.D. Pa. 1975). "The showing of a meritorious defense is accomplished when allegations of defendant's answer, if established on trial, would constitute a ***complete*** defense to the action." *$55,518.05 in U.S. Currency*, 728 F.2d at 195 (internal quotations omitted) (emphasis added). "To meet this factor, the defendants' answer and pleadings must contain ***specific facts*** that would allow them to advance a ***complete*** defense." *Choice Hotels Int'l, Inc*, 192 F.R.D. at 174 (internal quotations omitted) (emphasis added).

Conclusory allegations that do not assert sufficient specific facts that, if proven at trial, would amount to a complete defense do not constitute a meritorious defense sufficient to set aside a default. *See $55,518.05 in U.S. Currency*, 728 F.2d at 196–97 ("Golden neither denies any of these averments, nor questions whether the government has established probable cause. He merely asserts that the money 'was neither furnished nor intended to be furnished by any person in exchange for a controlled substance.' Furthermore, he fails to set forth any allegations containing facts which, if proven at trial, would constitute a meritorious defense to the forfeiture. . . . Because we agree with the Court below that Golden failed to establish

30

a meritorious defense, his motion to set aside the entry of default and the default judgment must be denied.") (internal citations omitted); *Choice Hotels Int'l, Inc*, 192 F.R.D. at 175 ("Other than Miller's conclusory assertions above, however, he makes no attempt to state specific facts that would allow him a complete defense. Therefore, I conclude that he has failed to establish a meritorious defense that, if proven at trial, would constitute a complete defense.").

The only substantive "affirmative defense" that Borrower sought to assert in the Proposed Answer was that "[Lender] breached its obligations as follows: (a) Failure to approve tenants; (b) Interference with leasing and construction; (c) Failure to approve or fund construction work for the Property; (d) Failure to approve sales of the property; and, [sic] (e) Failure to fund draws or fund draws timely." Appx398.[7]

Section 6.2 of the Loan Agreement explicitly conditioned any and all disbursements by Lender to Borrower with respect to the Projects on, *inter alia*, all of the terms and conditions of the Loan Agreement being satisfied and there being no Default or Event of Default by Borrower. Appx52. If there was any non-compliance by Borrower with the terms of the Loan Agreement, Lender had no obligation to make any such disbursements. Because Borrower repeatedly breached the Loan Documents (as established on the District Court record by unrefuted

---

[7] The remaining three "affirmative defenses" were boilerplate generic defenses completely unsupported by ***any*** factual allegations. Appx398.

31

evidence filed by Lender in the litigation below), Lender was never contractually obligated to disburse the Project-related funds.

Furthermore, in order for any action or omission by Lender to constitute a "breach" under the terms of the Loan Agreement, pursuant to Section 15.8.1 of the Loan Agreement, Borrower was required to provide Lender with a written notice of any such noncompliance within thirty days of Borrower learning thereof (and provide Lender with an opportunity to cure such noncompliance). Appx81.  In granting the Receivership Motion, the District Court put Borrower on notice that there can be no breach by Lender unless and until Borrower complies with this contractual notice requirement: "But even assuming [Lender] breached its obligation to disburse funds under the Loan Agreement, an allegation entirely unsupported by the record, [Borrower] did not provide notice of the breach to [Lender] within 30 days of any alleged noncompliance, a prerequisite to establishing breach under the Agreement." Appx385.

Yet even after being put on notice by the District Court of the contractual requirement that, before any purported action or omission by Lender becomes a "breach" of the Loan Documents, Borrower must provide a written notice to Lender within thirty days of learning of any such purported noncompliance, neither the Default Set Aside Motion nor the Proposed Answer alleged, much less provided any

32

admissible evidence, that any such contractually mandated notice was provided. Appx392–400.

Finally, even if, *arguendo*, (i) Lender was obligated to disburse the funds, notwithstanding Borrower's various Defaults and Events of Default (it was not), and (ii) Borrower provided Lender with the notice required under Section 15.8.1 of the Loan Agreement (it did not), Borrower would ***still*** have been obligated to make each and every monthly payment on time and "without counterclaim or setoff" under Section 2.3.4 of the Loan Agreement. Appx47.

In holding that Borrower failed to articulate a meritorious defense, the District Court made it clear that it considered the "defense" set forth in the Proposed Answer, reviewed whether such "defense" had any merit in light of the applicable provisions of the Loan Agreement and the District Court record, and determined that the "defense" was not, in fact, a meritorious one:

> Defendant's sole remaining defense, asserted with some degree of detail, was already raised and rejected in my memorandum appointing a receiver. Defendant alleges that Plaintiff breached the Loan Agreement for the reasons enumerated above, and thereby hindered Defendant's ability to make payments. But as I previously explained, "[w]ithout any affidavit or sworn declaration in support, these arguments represent nothing more than assertions by counsel which are not entitled to any weight."
> If Plaintiff nevertheless *did* behave as Defendant alleges, there are no facts asserted to show that Defendant sent Plaintiff a notice of breach within thirty days of alleged noncompliance, a prerequisite for Defendant to establish breach under the Loan Agreement. Thus, even if there were a factual basis for the

> purported defense it would fail as a matter of law. Because Defendant merely attempts to resurrect an argument already rejected, it fails to assert a potentially meritorious defense.

Appx689–690 (internal citations omitted) (alteration and emphasis in the original).

In the Appellant Brief, Borrower simply repeats the same argument as it unsuccessfully did on several occasions before the District Court regarding Lender's purported "breaches" pertaining to Project-related fund disbursement, which purported breaches allegedly "poisoned" Borrower's relationship with certain tenants. *See* Appellant Brief at 23–28. In doing so, Borrower (i) does not, because it cannot, provide any legal authority that the District Court or this Court may disregard the contractual provision that a written notice and an opportunity to cure is a prerequisite to there being any "breach" by Lender;[8] or (ii) point to any part of the record below that even suggests that Borrower actually complied with any of the pre-"breach" notice-and-cure provisions. As such, this argument is not supported by the terms of the Loan Agreement, the record below, or the applicable standard

---

[8] On the contrary, it is black-letter law that "[t]he parties [have] the right to make their own contract, and it is not the function of [the] Court to re-write it, or to give it a construction in conflict with that which accords with the accepted and plain meaning of the language used." *Hagarty v. William Akers, Jr. Co.*, 20 A.2d 317, 319 (Pa. 1941) (second alteration in the original).

34

promulgated by this Court with respect to what is necessary to establish a meritorious defense.[9]

The District Court correctly determined that Borrower failed to establish a meritorious defense. Borrower has failed to show that such determination was contrary to the Loan Agreement or unsupported by applicable law. As such, this Court should affirm the District Court's determination.

### c. *No Alternative Sanctions to Keeping the District Court Default in Place Were Available*

As recognized by the District Court, Borrower (i) repeatedly ignored basic evidentiary requirements in its attempts to litigate the matter below, and (ii) continued making the same legally and factually unsupported arguments regarding Lender's purported breaches. Appx383–384, Appx689–690. Borrower repeatedly refused to comply with the Receivership Order, which necessitated the Receiver's filing of the Borrower Noncompliance Motions, all of which were granted by the

---

[9] In the Appellant Brief, Borrower brings up its alleged attempt to refinance the Loan, implying that such alleged attempts to refinance should have somehow precluded Lender from initiating the foreclosure. *See* Appellant Brief at 25. Borrower unsuccessfully tried to make the same argument in the Receivership Motion Opposition Brief. Appx337–341. As the District Court correctly recognized in granting the Receivership Motion (in addition to finding that this allegation is "without factual support"), there is no language in the Loan Agreement even suggesting that Borrower's purported efforts to refinance the Loan entitled Borrower to forbearance by Lender from exercising its right to foreclose on the Property based on Borrower's repeated breaches of the Loan Agreement. Appx29–95, Appx383.

District Court. Appx1–5, Appx406–407, Appx748–749, Appx1196–1212. Vacating the District Court Default and permitting Borrower to continue litigating the action below notwithstanding Borrower's and Pulley's repeated bad-faith actions, lack of legal or factual support of its purported "defenses," and failure to comply with the Receivership Order would have simply wasted the parties' and the District Court's time and resources. Simply put, no alternative sanctions to keeping the District Court Default in place were available.

None of this was lost on the District Court in its consideration this last factor:

> Plaintiff has stated a case compelling enough to warrant the appointment of a receiver. Substantial evidence supports the existence of a breach and risk to the property. No purpose is served by vacating a default where no meritorious defenses exist, and where no underlying facts are likely to emerge supporting a potential defense. Setting aside default here would only multiply costly litigation, rendering alternative relief inappropriate.

Appx690 (internal citations omitted). In other words, the District Court considered the last factor and made a determination that there were no adequate alternatives to keeping the District Court Default in place. As set forth above, such determination is amply supported by the District Court record, which demonstrates that any alternative sanctions will likely be ignored by Pulley and Borrower.

The Appellant Brief does not challenge the District Court's determination that no alternative sanctions were available, further underscoring that the District Court made a correct determination. This Court should affirm such determination.

**B. The District Court Did Not Err in Entering the Default Judgment for the Full Amount of Borrower's Indebtedness Under the Loan Agreement**

1. Standard of Review

This Court reviews a district court's decisions pertaining to foreclosure receiverships for abuse of discretion. *See Wells Fargo Bank N.A. v. Ashley Bus. Park LLC*, 548 F. App'x 791, 793–94 (3d Cir. 2013) ("This Court gives great deference to a district court's interpretation of its own orders. In affording such deference, we apply an abuse of discretion standard. Because we are tasked with reviewing the District Court's interpretation of its own order (the order appointing the Receiver), the abuse of discretion standard applies.").

2. The District Court Did Not Abuse Its Discretion in Not Considering the Amounts Held by the Receiver When It Calculated the Amount of the Default Judgment

"A receivership in a foreclosure suit is limited and special. The rents and profits are impounded for the benefit of a particular mortgagee, to be applied upon the debt in the event of a deficiency." *Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216, 221 (1936).  Rents and other revenues collected by the court-appointed receiver should not be considered in determining the amount of the foreclosure judgment; rather, they are to be (i) used in conjunction with the operation of the property subject to receivership; and (ii) taken into account after the ultimate

disposition of the property at issue. *See Norwest Bank Minnesota v. Blair Rd. Assocs., L.P.*, 252 F. Supp. 2d 86, 104 (D.N.J. 2003) ("Any rents from the Rent Receiver to the Plaintiff since the last accounting can legitimately be held by the Plaintiff in the reserve account until the foreclosure sale, at which time they can be credited against the amount due on the Judgment. Mr. Black testified that Plaintiff requires funds to be deposited in reserves so that there are sufficient funds to pay for improvements or repairs. This reserve will be particularly important because there will undoubtedly be an appeal further delaying a foreclosure sale and justifying a Reserve Account for emergencies.").

The Receivership Order imposes obligations on the Receiver to, *inter alia*, take over all aspects of Property operations and the Projects, collect revenues, and pay the associated expenses. SAppx003–016.  It contemplates ongoing oversight by the District Court, requires that distributions of proceeds from Property sale must be approved by the District Court, and explicitly states that the receivership would continue even after the entry of the final judgment. SAppx003–016.

The amount set forth in the Default Judgment Order accurately reflects the amount due under the Loan Agreement, based on the applicable provisions of the Loan Agreement with respect to interest, and is supported by the detailed calculations in the Lawson Declaration. Appx6, Appx995–999.  The District Court specifically included language in the Default Judgment Order regarding potential

subsequent "credits and offsets," clearly contemplating adjustments based on rents and other revenues collected by the Receiver (whether before or after the date of the Default Judgment Order). Appx6. This approach is supported by applicable caselaw pertaining to foreclosure receiverships (including Supreme Court precedent), the structure and the language of the Receivership Order, and the nature and the purpose of the receivership. As such, the District Court did not abuse its discretion in entering the Default Judgment Order for the full amount that was due to Lender under the Loan Agreement, and this Court should affirm the Default Judgment Order.

## VI.   CONCLUSION

For all the foregoing reasons, Plaintiff/Appellee, ICON PSG 1 FL, LLC, respectfully requests that this Court affirm the District Court's (i) Order dated May 2, 2025, denying Defendant's/Appellant's Motion to Set Aside Default and Permit Answer; and (ii) Order dated July 18, 2025, granting the Lender's Request for Entry of Default Judgment in the amount of $22,056,659.26.

Respectfully submitted,

**KURTZ AND PARTNERS P.C.**

Date:  January 2, 2026

/s/ Gleb Epelbaum
Gleb Epelbaum, Esquire
Attorney I.D. No.: 320904
Swedesford Park, Building Three
1265 Drummers Lane, Suite 120
Wayne, PA 19087
(610) 688-2855
gepelbaum@kurtzpartners.com
*Attorneys for Plaintiff,*
*ICON PSG 1 FL, LLC*

## **Certificate of Compliance with Fed. R. App. P. 32(a)**

I, Gleb Epelbaum, hereby certify as follows:

1.       This Brief of Plaintiff/Appellee, ICON PSG 1 FL, LLC complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B) because this Brief contains 8,770 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

2.       This Brief of the Plaintiff/Appellee, ICON PSG 1 FL, LLC complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO with 14-point Times New Roman font.

Respectfully submitted,

**KURTZ AND PARTNERS P.C.**

Date:  January 2, 2026

*/s/ Gleb Epelbaum*
Gleb Epelbaum, Esquire
Attorney I.D. No.: 320904
Swedesford Park, Building Three
1265 Drummers Lane, Suite 120
Wayne, PA 19087
(610) 688-2855
gepelbaum@kurtzpartners.com
*Attorneys for Plaintiff,*
*ICON PSG 1 FL, LLC*

41

**<u>Certification Pursuant to 3d Cir. L.A.R. 31.1(c)</u>**

I, Gleb Epelbaum, certify pursuant to 3d Cir. L.A.R. 31.1(c) as follows:

1.      The text of the electronic Brief of Plaintiff/Appellee, ICON PSG 1 FL, LLC filed with this Court is identical to the text in the paper copies submitted to this Court.

2.      Prior to electronic submission to this Court, the file containing the Brief of the Plaintiff/Appellee, ICON PSG 1 FL, LLC, was scanned for viruses using the Windows Security application, version 1000.29429.0.1000, and no virus was detected.

Respectfully submitted,

**KURTZ AND PARTNERS P.C.**

Date:  January 2, 2026

*/s/ Gleb Epelbaum*
Gleb Epelbaum, Esquire
Attorney I.D. No.: 320904
Swedesford Park, Building Three
1265 Drummers Lane, Suite 120
Wayne, PA 19087
(610) 688-2855
gepelbaum@kurtzpartners.com
*Attorneys for Plaintiff,*
*ICON PSG 1 FL, LLC*

42

## Certification of Bar Membership

I, Gleb Epelbaum, certify pursuant to 3d Cir. L.A.R. 46.1(e), that I am a member of the Bar of this Court.

Respectfully submitted,

**KURTZ AND PARTNERS P.C.**

Date:  January 2, 2026

*/s/ Gleb Epelbaum*
Gleb Epelbaum, Esquire
Attorney I.D. No.: 320904
Swedesford Park, Building Three
1265 Drummers Lane, Suite 120
Wayne, PA 19087
(610) 688-2855
gepelbaum@kurtzpartners.com
*Attorneys for Plaintiff,*
*ICON PSG 1 FL, LLC*

43

## Certificate of Service

I, Gleb Epelbaum, certify that on the below date, I have caused true and correct copies of the Brief of the Plaintiff/Appellee, ICON PSG 1 FL, LLC and the Supplemental Appendix of Plaintiff/Appellee, ICON PSG 1 FL, LLC to be served upon filing on the following, who are registered as CM/ECF Filing Users and therefore consent to electronic service pursuant to 3d Cir. L.A.R. 113.2, via this Court's electronic docketing system pursuant to 3d Cir. L.A.R 31.1(d):

<table>
<tr>
<td>

Michael Yanoff, Esquire
GOLDSTEIN LAW PARTNERS, LLC
200 School Alley, Suite 5
Green Lane, PA 18054
*Attorneys for Defendant/Appellant,*
*Jenkins Court Realty Co., L.P.*

</td>
<td>

Raymond A. Quaglia, Esquire
Brian N. Kearney, Esquire
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
*Attorneys for the Receiver/Appellee,*
*Trigild IVL, LLC*

</td>
</tr>
</table>

Respectfully submitted,

**KURTZ AND PARTNERS P.C.**

Date:  January 2, 2026

*/s/ Gleb Epelbaum*
Gleb Epelbaum, Esquire
Attorney I.D. No.: 320904
Swedesford Park, Building Three
1265 Drummers Lane, Suite 120
Wayne, PA 19087
(610) 688-2855
gepelbaum@kurtzpartners.com
*Attorneys for Plaintiff,*
*ICON PSG 1 FL, LLC*

44