# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

Case No. 25-2598

## ICON PSG 1 FL, LLC,

Plaintiff-Appellee,

v.

## JENKINS COURT REALTY CO., L.P.,

Defendant-Appellant.

Appeal from the United States District Court for the
Eastern District of Pennsylvania, Docket No. 2:25-cv-00044-GAM

## SUPPLEMENTAL APPENDIX OF THE APPELLEE,
## ICON PSG 1 FL, LLC

Gleb Epelbaum, Esquire
Attorney ID No. 320904
KURTZ AND PARTNERS P.C.
Swedesford Park, Building Three
1265 Drummers Lane, Suite 120
Wayne, PA 19087
(610) 688-2855
gepelbaum@kurtzpartners.com
*Attorneys for Plaintiff/Appellee,*
*ICON PSG 1 FL, LLC*

# **TABLE OF CONTENTS**

ECF No. 6 – Waiver of the Service of Summons
January 15, 2025……………………………………………...SAppx001

ECF No. 13 – Order Appointing the Receiver
February 21, 2025……………………………………………….SAppx003

ECF No. 41 – Transcript of Motions Hearing Held on July 1, 2025
July 10, 2025……………………………………………….SAppx017

i

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| ICON PSG 1 FL, LLC<br>*Plaintiff*<br>v.<br>JENKINS COURT REALTY CO., L.P.<br>*Defendant* | )<br>)<br>)<br>)<br>)<br> Civil Action No.   2:25-cv-00044-GAM |

## WAIVER OF THE SERVICE OF SUMMONS

To:   Gleb Epelbaum, Esquire

*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____ 01/09/2025 _____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date:   1/13/2x

_____
Jenkins Court Realty Co., L.P.
*Printed name of party waiving service of summons*

_____
*Signature of the attorney or unrepresented party*

MICHAEL YANOFF
*Printed name*

610 Old York Rd Suite 340 Jenkintown, PA 19046
*Address*

MYanoff@Goldstan LP.com
*E-mail address*

267-627-2485
*Telephone number*

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

SAppx001

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ICON PSG 1 FL, LLC, | |
| Plaintiff, | CIVIL ACTION |
| v. | NO: 2:25-cv-00044-GAM |
| JENKINS COURT REALTY CO., L.P., | |
| Defendant. | |

## <u>CERTIFICATE OF SERVICE</u>

I, Gleb Epelbaum, Esquire, hereby certify that on this day, I caused to be served a true and correct copy of the foregoing Waiver of the Service of Summons via email and first-class mail to the following:

Michael Yanoff, Esquire
GOLDSTEIN LAW PARTNERS
610 Old York Road, Suite 340
Jenkintown, PA 19046
myanoff@goldsteinlp.com
*Attorneys for Defendant,*
*Jenkins Court Realty Co., L.P.*


**KURTZ AND PARTNERS P.C.**


Date: January 15, 2025

*/s/ Gleb Epelbaum*
Gleb Epelbaum, Esquire
Attorney I.D. No.: 320904
Swedesford Park, Building Three
1265 Drummers Lane, Suite 120
Wayne, PA 19087
(610) 688-2855
gepelbaum@kurtzpartners.com
*Attorneys for Plaintiff, ICON PSG 1 FL, LLC*

SAppx002

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ICON PSG 1 FL, LLC,** | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 25-0044** |
| | : | |
| **JENKINS COURT REALTY CO., L.P.** | : | |

**ORDER**

This 21st day of February, 2025, following review of Plaintiff ICON PSG 1 FL, LLC's Motion for Expedited Appointment of a Receiver, ECF 5, it is hereby ORDERED as follows:

1) The Receivership Motion is **GRANTED**.

2) Trigild IVL, LLC is appointed receiver ("Receiver") over all property in or upon which Plaintiff has a mortgage, lien, security interest, or assignment, including the Property owned by Defendant, Jenkins Court Realty Co., L.P. ("Defendant") located at 610 Old York Road, Jenkintown Borough, Montgomery County, Pennsylvania, Parcel ID # 10-00-05364-00-8 ("Property"), and all of the rents, incomes, revenues, and profits from the Property. The Receiver shall have all the usual powers and duties of receivers in such cases including, without limitation, the power to apply all monies collected by the Receiver to the necessary preservation of the Property, or as this Court otherwise may direct.

3) **Receiver's Bond.** The Receiver shall post a bond or cash in the amount of Ten Thousand Dollars and Zero Cents ($10,000.00) within fifteen (15) days of the entry of this Order (the "Bond"). Any Bond shall be provided by a corporate surety, guarantying performance by the Receiver of the duties and obligations of its office of receivership, with the Bond providing coverage to Plaintiff and Defendant for loss due to the acts of the Receiver and its agents, servants, or employees. The Receiver shall be liable only for acts of omissions which constitute gross negligence or willful misconduct. The Receiver shall have no personal responsibility for any

SAppx003

obligations of Defendant.

4) **Receivership Estate.** Upon entry of this Order, subject to the rights and interests of Plaintiff, the Receiver is hereby directed and empowered to take from Defendant, its agents, employees, representatives, and all of their affiliates and subsidiaries who not have or may in the future have any interest in the, immediate, complete, and exclusive possession and control of the Property, wherever located, including all payments, rents, incomes, revenues, and profits arising from the Property, all accounts, books, records, keys, equipment, and such other personally which may be found on or off the Property that relate in any way to the operation of the Property and which are subject to the mortgage, liens, or security interest of Plaintiff (collectively, the "Receivership Estate").

5) **Accounting by Defendant.** Within thirty (30) calendar days from the date hereof, Defendant shall prepare and file with the Court and serve on all parties hereto a detailed accounting of all income, expenses, receivables, and payables relating to the Property from the date of the most recent audited financial statement to the present.

6) **Operation of the Receivership Estate.** The Receiver is appointed to take charge of, and to use, manage, operate, and protect the Receivership Estate, and is granted all of the rights, duties, powers, authority, and responsibility of a court-appointed receiver, including those reasonably necessary to accomplish the purpose of this receivership.

a) Possession of the Receivership Estate. The Receiver is authorized and directed to enter upon, take possession of, and assume exclusive control of the Receivership Estate, wherever located, including, but not limited to (i) the Property; (ii) all inventory, equipment, and improvements at the Property; and (iii) all books, records, and personal property relating to the Receivership Estate. The Receiver is also authorized to demand, receive, collect, take possession of, and preserve all accounts related to the Receivership Estate and to exercise any and all intangible rights. The Receiver shall collect from Defendant and/or others all sums now due and unpaid or which hereafter shall become due during the pendency of this action arising out of or related to the Property.

SAppx004

b) <u>Exclusion of Defendant</u>.  The Receiver is authorized to exclude Defendant, its agents, management companies, employees, representatives, owners, affiliates, subsidiaries, and parent companies from possessing or operating the Property, except as expressly provided for in this Order or as may be expressly agreed by Plaintiff in writing in each instance, and it may change any and all locks at the Property.

c) <u>Exercise of Ownership Rights</u>.  The Receiver is authorized to exercise all rights as to the ownership of the Property subject to the limitations herein set forth.   The Receiver shall assume and exercise exclusively the powers and prerogatives of the board of directors, shareholders, and management of Defendant with respect to the Property.

d) <u>Construction Projects</u>.  The Receiver is authorized to take over, perform, resume, and/or complete any and all construction projects at the Property (collectively, the "<u>Construction Projects</u>") that are being performed by Defendant or its agents or contractors, were previously performed by Defendant or its agents or contractors, or are specified or contemplated in the loan documents between Plaintiff and Defendant evidencing the debt secured by the Property (collectively, the "<u>Loan Documents</u>").

e) <u>Authority to Contract</u>.  The Receiver may make, cancel, enforce, or modify contracts, leases, or licenses relating to any part of the Property or the Construction Projects.  The Receiver shall not be bound by any contract between Defendant and any third party that the Receiver does not expressly assume in writing related to the Property or the Projects.   It may also rent, lease, or license from time to time any part of the Property as may be deemed appropriate, and remove any tenant, lessee, or other person or entity from the Property as may be deemed appropriate by the Receiver, to the extent consistent with Pennsylvania law.

f) <u>Collection of Revenues</u>.  The Receiver shall demand, collect, and receive any and all rents, sub-rents, lease and sublease payments, fees, debts, or other proceeds, profits, or income of any type or nature and however denominated that may arise from the use or operation of the Property or are generated from the Receivership Estate (collectively, the "<u>Revenues</u>"), including any Revenues (i) received or collected by Defendant on or after the entry of this Order; (ii) currently due; (iii) hereafter becoming due; or (iv) due prior to the date of this Order, but only to the extent such rents have been withheld by any tenant and not paid to Defendant.   The Receiver is authorized to contact employees, tenants, subtenants, lessees, sublessees, lessors, account debtors, and/or any other parties to contracts or otherwise regarding the Receivership Estate and to receive, collect, and preserve from them all Revenues and other sums due to Defendant (as related to the Property).

g) <u>Employment of Agents</u>.  The Receiver may appoint, employ, and retain agents, employees, independent accountants, brokers, property management companies, auctioneers, legal counsel, and other similar professionals or personnel, any of which may be affiliates of the Receiver, that are reasonably necessary to take charge of, repair, operate, maintain, and to the extent necessary, liquidate, the Receivership Estate or to assist the Receiver in the performance of its duties pursuant to this appointment.   The Receiver shall have the right to direct and supervise the activities of all professionals and personnel so retained and may pay

3

SAppx005

reasonable value for those services from the revenues or proceeds of the Property, provided that any professional management company, broker, or contractor retained by the Receiver shall be engaged on terms which are reasonably satisfactory to Plaintiff. The Receiver is further authorized to discharge and terminate any such persons or entities currently in place or retained by it after the date of this Order. The Court reserves the right to determine hereafter the fair and reasonable compensation for all such persons retained by the Receiver, if any.

h) <u>Preservation of the Receivership Estate</u>. The Receiver shall care for, conserve, protect, preserve, improve, and maintain the Receivership Estate, and incur reasonable expenses which, in the Receiver's judgment and subject to the payment limitations provided in paragraph 7 below, are necessary and proper to continue, operate, maintain, and preserve the Receivership Estate including, but not limited to, incurring expenses relating to security for the Property; providing pest control; obtaining estimates and reports and making repairs in conformity therewith; providing water, garbage collection, and utilities; purchasing merchandise, materials, and supplies and services at the ordinary and usual rate and prices for such items out of the funds of the Receivership Estate; and undertaking and performing the Projects either previously undertaken by Defendant or those specified or contemplated under the Loan Documents.

i) <u>Payment of Necessary Expenses</u>. Subject to the payment limitations provided in paragraph 7 below, the Receiver is authorized and instructed to pay from the revenues of the Property the ordinary and necessary expenses of operating, preserving, and maintaining the Property incurred from and after the date of the Receiver's appointment and said other reasonable expenses necessary to maintain the Property, including any property taxes, assessments, payments in lieu of taxes, utility charges, and/or Project-related costs and expenses. The Receiver shall also have the power and authority, subject to the approval of Plaintiff, to pay expenses incurred or related to the Property which were incurred prior to the appointment of the Receiver.

j) <u>Establish Accounts for Receivership Estate</u>. The Receiver shall deposit all Revenues generated by the Property in a segregated interest-bearing account at a financial institution approved by Plaintiff.

k) <u>Budget</u>. The Receiver shall prepare a reasonable monthly operating budget for the Property which shall be submitted to Plaintiff for its approval. The initial budget shall be submitted within thirty (30) calendar days of this Order. At Plaintiff's request, the Receiver shall also produce an annual budget. The budget, once approved by Plaintiff, shall deemed the "<u>Budget</u>" for all purposes set forth in this Order.

l) <u>Limited Borrowing Capacity</u>. The Receiver shall have the right, but not the obligation, to borrow funds from Plaintiff (to the extent Revenues generated by the Property are insufficient) in order to meet the Property's working capital needs, but only in such amounts and to the extent permitted under the Loan Documents and on such terms and conditions agreeable to Plaintiff and with Plaintiff's prior written consent. Repayment of any such loans

4

SAppx006

shall be secured by all of the mortgages, liens, security interest, and assignments upon the Property previously granted, transferred, or otherwise conveyed by Defendant to Plaintiff, and any such loans shall be treated as secured debt of Defendant. Plaintiff shall have no obligation to make any loans or credit accommodations to the Receiver.

m) <u>Actions to Preserve the Estate</u>. The Receiver is authorized to institute, prosecute, defend, compromise, intervene in, and settle such suits, actions, and proceedings as the Receiver deems necessary in its reasonable judgment, relating to the protection, maintenance, operation, enhancement, or preservation of the Receivership Estate, or the performance of its obligations under this Order (including but not limited to, the institution of actions to collect rents, evict tenants, and recover rents or portions of the Property), and to employ counsel as may be necessary for such proceedings, and to pay the reasonable value of services rendered out of funds of the Receivership Estate, and thereafter to report to the Court at reasonable intervals upon such proceedings. The Receiver is also authorized to challenge the validity, enforcement, and amount of any taxes accruing on the Property, including any assessment or claim of taxes due by Defendant or any third-party. Furthermore, the Receiver shall have the exclusive right and power to assert and prosecute any and all claims, counterclaims, and crossclaims that Defendant ever had, now has, or may in the future have, whether known or unknown, against any and all parties related in any way to the Loan Documents and/or the Property, including, without limitation, claims for breach of contract, negligence, fraud, or based on any other theory of liability, against Plaintiff, its subsidiaries, affiliates, owners, agents, and/or employees. The powers set forth in the prior sentence shall be in the sole possession and control of the Receiver with the intent to make the Receiver a required or indispensable party in any litigation.

n) <u>Insurance Coverage</u>. The Receiver shall obtain or continue such insurance coverage for the Receivership Estate as it deems reasonably necessary, but in no event shall the Receiver maintain insurance in an amount less than that required under the Loan Documents. Upon the expiration of the paid-up portion of any insurance policy, the Receiver shall have the responsibility for keeping the Property insured and may, at its option, keep in force the existing insurance coverage or obtain new coverage for the Property subject to the requirements herein. The Receiver shall have itself and Plaintiff named as additional insureds on all applicable polices for the period that it shall be in possession of the Receivership Estate. The Receiver shall also insure the acts and conduct of the Receiver and those persons who it may employ to carry out the duties upon it. The Receiver shall provide to the Court and Plaintiff proof that it has been insured and bonded for the purposes of performing all acts contemplated in this Order, and that proper insurance has been put on the Property within thirty (30) calendar days of the entry of this Order. No insurance company may cancel its existing current-paid policy as a result of the appointment of the Receiver without prior order of this Court.

o) <u>Maintain Compliance with Applicable Law</u>. The Receiver shall take all such actions and expend all such sums as may be necessary to obtain, maintain in effect, or transfer all licenses, insurance, zoning approvals, and other approvals necessary or required to maintain or operate the Property.

5

SAppx007

p) <u>Plan to Maximize Revenues and Sell the Property</u>. The Receiver is empowered to explore all available options for increasing the revenues created by the Property and to explore all available options for the sale of the Property by any reasonable means that will, within the Receiver's business judgment, maximize the realization from the sale of the Property. Subject to Plaintiff's prior written approval, the Receiver will file a report making recommendations to the Court with regard to the use and/or marketing and disposition of the Property. The Receiver, upon its own initiative or at the direction of Plaintiff, and with or without the assistance of a broker, may market and sell all or any part of the Property either pursuant to the rights granted under the Loan Documents or as otherwise provided at law or equity. With respect to any possible sale of the Property, the Receiver shall not enter into any contract for sale unless the Receiver is requested to do so in writing by Plaintiff and the sale is subject to confirmation by the Court on regular notice to the parties to his case. Notwithstanding the foregoing, nothing contained in this paragraph or this Order shall alter, modify, subordinate, or impair any existing rights, interests, or remedies of Plaintiff, including but not limited to Plaintiff's rights under the Loan Documents.

q) <u>Make payments Pursuant to the Loan Documents</u>. The Receiver may pay amounts which are owed to Plaintiff pursuant to the Loan Documents as the Receiver receives Revenues sufficient to make such payments and pursuant to the priority provided in this Order.

r) <u>Ancillary Powers of the Receiver</u>. The Receiver is hereby authorized and directed to operate and manage the Property in the best interests of Plaintiff and to take all action deemed reasonable and necessary to ensure compliance with all applicable requirements imposed by local, state, or federal law, and regulations promulgated by the Commonwealth of Pennsylvania (or any corresponding federal agency or agencies). The Receiver may generally do, execute, and perform any other act, deed, matter, or thing whatsoever that the Receiver reasonably deems ought to be done, executed, and performed in and about or with respect to the Property or the Revenues, or to implement the terms of this Order.

s) <u>Access</u>. The Receiver shall take possession of all keys and/or other means of gaining entry to the Property, and through any security system, in order to perform the Receiver's duties. The Receiver may engage a locksmith for the purpose of gaining entry or access to the Property, through any security system, and into any offices or locked drawers, cabinets, safe deposit boxes, and the like, in order to obtain any documents or property to which the Receiver is entitled to under this Order. The Receiver may either have the locks changed or create a key that will access the current locks.

**7) <u>Expenditures</u>.**

a) <u>Payment Priority</u>. The Receiver shall apply all Revenues arising from or collected from the Receivership Estate, monthly or more often, to the following expenditures, in such order of priority as the Receiver shall determine:

(1) FIRST, to the extent funds are not otherwise available from Defendant, to the necessary and reasonable costs of maintaining, managing, operating, and preserving the Receivership Estate as provided in the Budget approved by Plaintiff or the Court,

6

SAppx008

including payments to the Receiver for protection of the Property and the payment of all licenses, permits, and agreements that the Receiver shall deem necessary and in the best interest of preserving the Property and for the continued operation thereof, including the fees of the Receiver as set forth herein and any broker and/or management company hired by the Receiver, all in accordance with applicable local, state, and federal law and regulations;

(2) SECOND, to the reasonable out-of-pocket expenses of the Receiver, including all advances made by the Receiver, or to the repayment of any payments or advances made by Plaintiff, reasonably necessary to preserve or conserve the Property;

(3) THIRD, as provided under the Loan Documents to the payment of the reasonable fees, expenses and extraordinary fees and expenses of Plaintiff, including reasonable attorneys' fees and expenses, not otherwise paid or reimbursed to Plaintiff by Defendant;

(4) FOURTH, to the payment of the indebtedness payable by Defendant under the Loan Documents; and

(5) FIFTH, to the funds to be held by the Receiver in federally insured, interest- bearing accounts, pending further order of this Court.

b) <u>Rights and Obligations of Plaintiff</u>.   The payments required in the Third and Fourth subparts of Paragraph 7.a above shall be made by the last day of each month commencing the first full month following entry of this Order; <u>provided</u>, <u>however</u>, that nothing in this paragraph shall require the Receiver to pay Plaintiff any amount if the funds the Receiver receives are not sufficient to cover all amounts specified in the First and Second subparts of Paragraph 7.a above and sufficient funds that the Receiver deems reasonable to cover one month of the expenses of the receivership in accordance with the Budget or otherwise approved by Plaintiff. Plaintiff shall have no obligation or liability, at law or equity, to any person for petitioning for the appointment of a receiver or in connection with, or as a consequence of, the Receiver's actions or inactions in this matter (including its failure to pay any supplier, vendor, or other creditor of the Property or the Receivership Estate).  In the event revenues or proceeds for the Property are insufficient to pay the liabilities incurred by the Receiver (or any successor receiver, bankruptcy trustee, or otherwise), Plaintiff shall have no liability or other obligation to any such party for amounts that such party believes it is owed on account of the operation of this receivership.

c) <u>Payment Limitations</u>.    Notwithstanding Paragraphs 7.a and 7.b above, the Receiver shall make no payment that exceeds $5,000.00 for any one item (excluding property taxes, emergency repairs, monthly or recurring operating charges, or any expense included in the Budget previously approved by Plaintiff), or which exceeds more than ten (10%) percent of the amount budgeted for any particular line item on the Budget, without the written consent of Plaintiff, or further order of this Court after notice to the parties and an opportunity for hearing.

8) **Compensation of Receiver.**  The Receiver's compensation for services under this Order, not

7

including any fee of any broker, auctioneer, attorney, or accountant retained by the Receiver, shall be in accordance with the fee schedule set forth in *Exhibit 4* to the Receivership Motion. The Receiver and those employed by the Receiver shall furnish Plaintiff and other parties to this action with copies of their invoices for services rendered and expenses incurred on a monthly basis. The payment of fees and expenses to the Receiver shall be on an interim basis, subject to final approval by this Court, and the Court retains jurisdiction to award a greater or lesser amount as the full, fair, and final value of such services. When the Receiver files its final report and motion for discharge, the Receiver shall file with this Court a fee application for final approval of the fees and expenses paid to the Receiver during the pendency of the receivership. Plaintiff's right to object to any fees and expenses as unreasonable is preserved. To the extent that the funds received by the Receiver pursuant hereto are insufficient to pay the Receiver amounts incurred by the Receiver in accordance herewith, the Receiver shall have a charge against the Property, which charge shall have priority over all claims of any claimants or creditors of Defendant; provided, however, that any right, claim, or charge of the Receiver shall be co-extensive with and *pari pasu* with the rights and claims of Plaintiff for the payment of its fees and expenses, including Plaintiff's attorneys' fees (in accordance with the Loan Documents).

9) **Reporting Requirements of the Receiver.** The Receiver shall maintain an accounting and keep accurate records concerning the Receivership Estate from the date of entry of this Order. Among the records to be kept are the actual revenues collected and expenses paid each month, and any other records which may be required by any law, or would be reasonable and prudent to keep under the circumstances. Such records shall be made available, upon reasonable request and notice, to Plaintiff and Defendant, and shall be included in the quarterly reports made to this Court. In addition, the Receiver shall also file the following reports with the Court:

a) Inventory of Receivership Estate. The Receiver shall conduct an inspection of the Property and shall perform a complete inventory of the Property coming under its control or possession

8

SAppx010

under this appointment. Such inspection and inventory shall be conducted jointly and with the cooperation of Defendant and/or its designated agent or representative (to the extent the same are available). Within thirty (30) calendar days of this Order, the Receiver (joined by the agent or representative of Defendant, to the extent available), shall file with this Court a true and complete inventory of all property in its possession pursuant to this Order, and any other property which may subsequently come into its possession. The Receiver shall also conduct periodic accounts thereafter.

b) <u>Quarterly Report</u>. Commencing on the twenty-fifth (25th) day of the third full month following entry of this Order, and continuing on the twenty-fifth (25th) day of every third month thereafter during the pendency of the receivership, the Receiver shall file with this Court and serve on Plaintiff, Defendant, and the respective counsel in this case, report(s) concerning the operation and financial performance of the Property for the prior quarter, in such form and with such content as Plaintiff hereafter reasonably requires. The quarterly reports shall include (a) a listing of significant events occurring during the relevant period as well as any actions taken by the Receiver during that time; (b) a statement of the receipts and expenditures since the last report; (c) the current accounts receivable and accounts payable related to the Property; (d) a statement of all cash held or invested by the Receiver and the manner in which it is held and/or invested; (e) an inventory and account of any additional property or effects which it has discovered or which shall have come into its hands since its appointment; and (f) the balance due from or to the Receiver since the rendering of its last account.

10) **Turnover of Property.** Defendant and its independent contractors and agents, and all persons in active concert and participation with them, including officers, directors, employees, agents, accountants, attorneys, insurers, utilities, and banks, are ordered to deliver immediately over to the Receiver or its agents, whenever received, all property in the Receivership Estate, including, without limitation, the Property, any and all cash, Revenues, rental payments, and lease payments, keys to any aspect of the Property (including to all outbuildings and machinery located upon the Property or used in the operation and maintenance of the Property), accounts receivable, security deposits, trust accounts, bank accounts, personnel files, operations manuals, financial records, payroll records, certificates and licenses, contracts, leases, books, insurance certificates, binders, or other records relating to the operation, maintenance, and management of the Property, fixtures, inventory, supplies, furniture, and equipment used or associated therewith, and all other things of value relating to the Property and necessary to permit the Receiver to carry out its duties under this Order without interference or delay. Rents and security deposits received by Defendant or

9

SAppx011

any of its agents shall be deemed held in trust for the benefit of the Receivership Estate and shall be delivered to the Receiver within the later of two (2) business days after the date this Order is entered or two (2) business days of receipt by Defendant. Any security deposit or other deposits which tenants have paid to Defendant or its agents and which are not paid to the Receiver, and over which the Receiver has no control, shall be obligations of Defendant, and may not be refunded by the Receiver without further order of Court. Any security deposits which the tenants have paid or may pay to the Receiver, if otherwise refundable under the terms of the applicable leases or agreements, shall be refunded by the Receiver in accordance with the terms of the applicable leases or agreements.

11) **Turnover of Funds**.

    a) <u>Funds Held by Defendant, Its Agents, and/or Its Affiliates</u>. Except as may be expressly authorized by this Court in this Order or hereafter upon notice and a hearing, Defendant, its affiliates, and each of their respective successors, assigns, agents, or any persons or entities claiming by, through, or under any of them, are hereby required to pay and turn over immediately to the Receiver, and to perform all acts necessary to transfer to the Receiver, all funds on hand in cash and all funds held in deposit accounts of or for the benefit of the Receivership Estate arising from the ownership, possession, or operation of the Property and all accounts, accounts receivable, and any other collectibles and all keys, books, records, equipment, and all things in any manner related to the ownership, possession, or operation of the Property.

    b) <u>Funds Held by Third Parties</u>. Any bank, savings and loan association, broker, escrow agent, title company, and any other financial institution or other entity, wherever located, which is served with a copy of this Order shall, within ten (10) calendar days of being provided with a copy of this Order, turnover or transfer to the Receiver all property and/or funds properly belonging to the Receivership Estate which are in such party's possession, custody, or control, together with all records relating to such property and/or funds.

12) **Injunction Against Defendant**. Except as may be expressly authorized by this Court in this Order or hereafter upon notice and a hearing, Defendant, its affiliates, and each of their respective management, members, partners, shareholders, board of directors, and all of their respective successors, assigns, employees, agents, attorneys, or any persons or entities claiming by, through, or under any of them are hereby enjoined from:

10

SAppx012

a) Possessing, managing, or controlling any part of the Receivership Estate and from interfering in any way with the possession or management of the Property by the Receiver, including terminating or causing to be terminated any license, permit, lease, contract, or agreement relating to the Receivership Estate or the operation of the Property, including, without limitation, any insurance policy or agreement with any utility;

b) Collecting, withdrawing, transferring, conveying, concealing, or otherwise disposing of any part of the Receivership Estate, including cash, any portion of the Property, and the proceeds derived therefrom, including, without limitation: (i) collecting any Revenues, rents, issues, proceeds, or profits from the Receivership Estate; (ii) withdrawing funds from any bank or other depository account relating to the Receivership Estate; (iii) causing the cancellation or termination of any policy of insurance; (iv) directing the remittance of any premium refund or any funds generated or payable on account of such termination of any such policy; or (v) causing any change or cancellation of any agreement with any utility for the provision of electricity, gas, water, telephone or cable services to any part of the Property; Removing any property from the Property and from removing, destroying, concealing, changing, or altering in any manner any of the books or records relating to the ownership, possession, or operation of the Receivership Estate.   Defendant and its agents are expressly charged with the duty of advising all banks, depositories, insurance companies, utilities, and creditors, if requested to do so by the Receiver, of the contents of this Order, and its agreement that the Receiver be given full and sole access to all accounts, contracts, or other rights and entitlements which previously inured to the benefit of Defendant and/or its agents; and

c) Filing any petition under the United States Bankruptcy Code, as this right is in the exclusive purview of the Receiver.

d) Except as provided in this Order or as expressly consented to by Plaintiff in writing, Defendant is prohibited from dealing with the Property in any manner.

13) **Claims Against Receivership Estate Against Creditors.**  In the event that either the Receiver or Defendant is served with process or are otherwise notified of any pending lawsuit which could result in a lien or charge against the Receivership Estate if reduced to judgment, or which could adversely affect the possession of the Receiver of any of the Receivership Estate, the Receiver shall notify the plaintiff in such case of this Order, and such plaintiff shall serve a claim upon the Receiver.  Defendant shall fully cooperate with the Receiver in notifying the Receiver and Plaintiff of any such claim made by legal process upon it by immediately contacting the Receiver and Plaintiff and making the Receiver and Plaintiff aware of the pendency of any such action. The Receiver may petition this Court for any orders necessary (including for contempt) of any violation of this Order by Defendant, any creditor, or any other party.

11

SAppx013

14) **No Discrimination.** No person or entity shall discriminate with respect to Defendant or the Receiver on account of the appointment of the Receiver in this proceeding. No government entity shall deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to Defendant solely because the Receiver has been appointed pursuant to this Order.

15) **Limitation on Receiver's Duties.** With the exception of performing the Projects that have already commenced at the Property or those specified or contemplated under the Loan Agreement, the Receiver shall not be obligated to upgrade the Property or to make any improvements thereto, unless and until either directed by Plaintiff in writing or ordered to do so by the Court. The Receiver shall not be obligated to contribute its personal funds in the performance of its duties hereunder, and the receivership is to be conducted solely from the funds arising from the Receivership Estate. No obligation incurred by the Receiver shall be its personal obligation.

16) **Inspection of Receivership Estate.** The Receiver shall permit Plaintiff, upon reasonable request and notice, to fully inspect the Receivership Estate and the books and records kept in connection with the operation of the Property.

17) **Reservation of Rights by Plaintiff.** Following the entry of this Order, Plaintiff shall retain all rights and remedies under the Loan Documents and applicable law, and all such rights and remedies are hereby preserved. Specifically, and without limiting the preceding sentence, the Court hereby authorizes Plaintiff to exercise its remedies to sell all or any part of the Receivership Estate as necessary in its sole discretion in accordance with the Loan Documents, including, but not limited to, by way of foreclosure, sale, or lease, as well as any and all other rights and remedies provided for under the Loan Documents, at law, or in equity.

18) **Distribution of Sale Proceeds.** In the event the Property and/or any part of the Receivership Estate is sold by way of sale by the Receiver, after deducting expenses incurred in connection

12

SAppx014

therewith, all proceeds of such sale shall be held in escrow by the Receiver, unless otherwise ordered by this Court.

19) **No Duty to Defend Defendant.** The appointment of the Receiver extends only to the Property and the Receivership Estate and does not impose upon the Receiver any affirmative duty to act on behalf of or defend Defendant. Notwithstanding any other provision hereof, the Receiver shall be under no obligation to complete or file tax returns on behalf of Defendant or file other regulatory or other governmental reports on behalf of Defendant. Responsibility for such filing remains with Defendant.

20) **Supplemental Direction or Instruction.** The Receiver shall undertake any and all additional duties as this Court may provide by its orders. Plaintiff or the Receiver (for as long as this Order remains operative) may, from time to time, request that the Court enter additional orders to supplement, clarify, effectuate, or amend this Order, or to provide further direction to the Receiver.

21) **Taxpayer Identification Numbers.** The Receiver may use any federal taxpayer identification numbers of Defendant relating to the Property for any lawful purpose.

22) **Collection of Mail.** The Receiver may take any and all steps necessary to receive, collect, and review all mail addressed to Defendant or any of its agents which the Receiver has reasonably determined may contain invoices related to the operation of the Receivership Estate or Revenues to which the Receiver is entitled as set forth herein, and the Receiver is authorized to instruct the United States Postmaster to reroute, hold, and/or release such mail to the Receiver. Upon request, mail received by the Receiver in the performance of its duties will be made available promptly to the addressee after review by the Receiver, provided, however, the Receiver shall be further authorized to remove, take possession of, endorse, and negotiate all checks or other instruments payable to Defendant or any of its agents pertaining to the Property, the Receivership Estate, or

13

SAppx015

the Revenues.

23) **<u>Court Permission for Suit</u>.** No individual or entity may sue the Receiver for any alleged breach of its duty pursuant to this appointment without first obtaining the permission of this Court.

24) **<u>Service of This Order</u>.** Plaintiff shall forthwith provide a copy of this Order, as entered by the Court, to Defendant or Defendant's counsel of record in this matter (if counsel entered his or her appearance) via first-class mail, electronic mail, or nationally recognized overnight delivery service provider (e.g., UPS, FedEx). The Receiver shall provide a copy of this Order via first-class mail, electronic mail, facsimile, or nationally recognized overnight delivery service provider (e.g., UPS, FedEx) to the applicable taxing and utility authorities and any persons in possession of any part of the Receivership Estate or otherwise affected by this Order. Upon service of this Order upon any person or entity, or any employee or agent of such person or entity, such person shall be deemed to be required to comply with all of the terms of this Order from the moment of service upon such person, entity, agent, or employee until the Court shall have relieved such person from the terms of this Order by way of a subsequent order. "Service" shall constitute oral or written notice of this Order in any form (including by facsimile or electronic mail) to the office of any person to be bound thereby.

25) **<u>Retention of Jurisdiction</u>.** Except as otherwise provided herein, this receivership action shall continue until further order of this Court. This Court retains jurisdiction to modify the terms of this Order and to expand or contract the rights, duties, and obligations of the Receiver or any other party affected by this Order, and to enter such other orders as may from time to time, during the pendency of this action, be deemed necessary, just, and proper. The provisions of this Order shall survive entry of judgment and shall govern with respect to any conflict with any subsequent order of Court, irrespective of whether this case is dismissed, stayed, or transferred.

/s/ Gerald Austin McHugh  
United States District Judge

SAppx016

```
                   UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF PENNSYLVANIA

ICON PSG 1 FL, LLC,              :  Case No.: 2:25-CV-00044-GAM
                                 :
         Plaintiff,              :
                                 :
         v.                      :
                                 :
JENKINS COURT REALTY             :
CO., L.P.,                       :
                                 :  July 1, 2025
         Defendant.              :  10:00 A.M.
-------------------------------x


                   TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE GERALD A. MCHUGH
               UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Plaintiff:        GLEB EPELBAUM, ESQUIRE
                          Kurtz and Partners P.C.
                          1265 Drummers Lane, Suite 120
                          Wayne, PA 19087
                          (610) 688-2855
                          gepelbaum@kurtzpartners.com


For the Defendant:        MICHAEL YANOFF, ESQUIRE
                          Goldstein Law Partners LLC.
                          610 Old York Road, Suite 340
                          Dresher, PA 19025
                          (267) 627-2485
                          myanoff@goldsteinlp.com

                          SHAWN RODGERS, ESQUIRE
                          Goldstein Law Partners LLC.
                          610 Old York Road, Suite 340
                          Dresher, PA 19025
                          (267) 627-2485
                          srodgers@goldsteinlp.com

                          DANIEL SIEDMAN, ESQUIRE
                          Ciardi Ciardi & Astin
                          2005 Market Street, Suite 3500
                          Philadelphia, PA 19103
                          (215) 557-3550
                          dsiedman@ciardilaw.com
```

APPEARANCES:
(continued)

For the Receiver          RAYMOND A. QUAGLIA, ESQUIRE
Trigild IVL, LLC          Ballard Spahr Andrews & Ingersoll, LLP
                          1735 Market Street, 51st Floor
                          Philadelphia, PA 19103
                          (215) 665-8500
                          quaglia@ballardspahr.com

                          BRIAN KEARNEY, ESQUIRE
                          Ballard Spahr Andrews & Ingersoll, LLP
                          1735 Market Street, 51st Floor
                          Philadelphia, PA 19103
                          (215) 665-8500
                          kearneyb@ballardspahr.com

Court Reporter:           Christian Henry
                          U.S. District Court
                          James A. Byrne U.S. Courthouse
                          601 Market Street
                          Philadelphia, PA 19106

Transcription Service:    Burke Court Reporting, LLC
                          64 Magnolia Place
                          Wayne, New Jersey 07470
                          www.BurkeCourtReporting.com
                          (973) 692-0660

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

SAppx018

```
                              INDEX
COURT'S
WITNESSES:               DIRECT   CROSS   REDIRECT   RECROSS

PHILIP PULLEY
     By The Court          28       --      --        --

JONATHAN LAKNER
     By The Court          37       --      --        --


EXHIBITS:                          Marked     Received

(None)
```

4

(Proceedings commenced at 10:06 a.m.)

THE COURT:  All right.  We can go on the record. This is ICON PSG 1, LLC versus Jenkins Court Realty Company, L.P., Civil Matter 25-44.  Would Counsel please identify themselves for the record?

MR. QUAGLIA:  Good morning, Your Honor.

Ray Quaglia from the Ballard Spahr firm on behalf of the Receiver in this case, Trigild.  I have with me Jonathan Lakner, not an attorney but a Trigild representative who's available for testimony, as needed.  And my colleague, Brian Kearney, a proud Prep graduate.

THE COURT:  All right, then, gentlemen.  Good morning.

MR. QUAGLIA:  Good morning.

MR. KEARNEY:  Good morning.

MR. EPELBAUM:  Good morning, Your Honor.

Gleb Epelbaum from Kurtz and Partners.  I represent the Plaintiff.  I have with me Cameron Lawson who provided the declaration in support of the default judgment.  And he's here, and to the extent necessary, for testimony.

THE COURT:  Good morning, gentlemen.

MR. YANOFF:  Good morning, Your Honor.

Michael Yanoff of Goldstein Law Partners here with my partner, Shawn Rodgers.  And we're here representing Jenkins Court along with Daniel Siedman who will introduce himself.

5

MR. SIEDMAN:  Good morning, Your Honor.

Daniel Siedman from Ciardi Ciardi & Astin, co-counsel for the Defendants.

THE COURT:  Have you entered an appearance, Mr. Siedman?

MR. SIEDMAN:  I did file a document last week.  So I am on the docket sheet.  But --

THE COURT:  All right.  Turns out you are.  Okay. Looks like you are on the docket.  Thank you.

MR. SIEDMAN:  Late.  Late to the show, but I'm here. Thank you, Your Honor.

THE COURT:  And you're with Mr. Ciardi's firm.

MR. SIEDMAN:  Yes.

THE COURT:  All right.  We're here on three pending motions.  The first is a request for entry of a default judgment.  I mean, having reviewed the parties' submissions, seems to me that, at a minimum, the Defense agrees that $18,736,018.28 is not in dispute.  And so at least to that extent, regardless of whether there are any other issues that need to be resolved about the total amount of the judgment, it seems to me minimally, a judgment could be entered in that amount.

Defense, any rejoinder to that?

MR. YANOFF:  We agree with that, Your Honor.

THE COURT:  All right.  And then the question becomes

6

how does one address the disputes about the credits, interest, et cetera?  Let me turn to the Plaintiff and ask if they have any suggestions in that regard.

MR. EPELBAUM:  Sure, Your Honor.  So I'm sure you've had a chance to review the request for default judgment.  Now, just full disclosure, originally it was filed as a request to the Clerk under Rule 55(b)(1).  I guess at some point it made its way to Your Honor, and which is why we're here.

So from our perspective, I mean, it's the calculations are more or less straightforward.  They were provided in the request for default judgment.  You have the amounts that are set forth in the complaint.  Then those are all obviously at this point no longer challengeable, so to speak, because a default was entered.

So it's just a question of the additional interest that has accrued on that amount, and the declaration Mr. Lawson kind of walks the -- walks through how the calculations were made.  They were all under the default interest.  I know there's a -- this submission from the Defendant that seems to dispute that.  But again, under the loan documents, in the event of default, automatically triggers default interest.  So the reason --

THE COURT:  Well, putting the one aside, the interest, I hear you saying as a matter of law, the Defense requests for a credit having to do with funds and collections

7

is legally relevant.

MR. EPELBAUM: Correct. So I think there's some confusion as to the various parts and their respective roles in this case. Obviously, we have the Plaintiff who's the lender who lent the funds. The loan was in default which is we accelerated the loan. So the fund -- none of the amounts that are owed under the complaint have been paid to the lender.

Now, the Receiver has been appointed to operate the property. So the money is -- it's collecting rent, so the money's going in. They are paying the expenses associated with one of the properties. The money's going out.

THE COURT: I get all that.

MR. EPELBAUM: Yeah.

THE COURT: But you're saying whatever the face amount of the loan was, because of the default, and by operation of law the full amount due under the loan is the amount, and that the credits that are claimed by the Defense, as I understand it, you're saying that they don't matter, Judge, because we're entitled to the face amount of the loan. Is that your position?

MR. EPELBAUM: So it's with an asterisk, yes. So they don't matter at this point. So we're at the juncture where the next step is to get the default judgment. So when, down the road --

THE COURT: Well, you're $18 million ahead on that

8

score.

MR. EPELBAUM:  So from our position, it's whatever the amount is in the request, 22 and change plus whatever the contractual interest continues to accrue, that is what the judgment at this point should be entered for.  And then when there's ultimate disposition of the property and there's a final accounting by the Receiver, then all the debits and credits are accounted for, and then the distributions are made according to what is actually recovered by the Receiver, both as a sale of property and whatever the money may have come in, or to the extent it wasn't used to pay the expenses.

THE COURT:  All right.  So your position is there may come a point in time at which the Defense is entitled to some credit, but that point in time id downstream after all of the assets have been collected and the estate's been administered, estate for want of a better word, estate of the receivership, whatever we call it.  And then it could be that at some point, then the Defense is due a credit.  But right now, they're not.  Is that your position?

MR. EPELBAUM:  That is correct, Your Honor.  And --

THE COURT:  All right.  So let me hear back from the Defense.

MR. SIEDMAN:  Good morning, Your Honor.

So in essence, what we have here is a motion to reassess damages as of May 23rd when they filed the request for

SAppx024

9

default.  They would like to carry default interest through May, but they're unwilling to provide any accounting or any other calculation as to rents that were received from January -- December through May.

So as Your Honor noted at the beginning, the 18 million and change is not disputed.  That's the date -- that's the amount that we would agree that they are.  Anything additional would need evidentiary hearing as to an accounting, both whether or not they're entitled to the continued interest and --

THE COURT:  Put interest -- let's segregate interest.

MR. SIEDMAN:  Okay.  Segregate interest.

THE COURT:  Yes.

MR. SIEDMAN:  The --

THE COURT:  So they say --

MR. SIEDMAN:  Yeah.

THE COURT:  -- there was the face amount of the loan. Here's the --

MR. SIEDMAN:  Contractual versus default, yeah.  We can put that aside.

THE COURT:  All right.  Well, follow along.

MR. SIEDMAN:  Okay.

THE COURT:  Put interest over here.  They say the face amount of the loan is 20 million, whatever it is.  And in the event of default, we have a right to judgment in that

SAppx025

amount. And it doesn't matter what income the property's generating in the meantime, and it doesn't matter anything else. There may come a point downstream where, after all is said and done, some money flows back to your client.

But we're not at that point yet because under the literal terms of the document, the judgment they're entitled to is the judgment for the face amount of the mortgage. So what is your response to that what I take to be a legal position?

MR. SIEDMAN: So the Plaintiff also took an assignment of rents in December. So from the period of December, January, and February, the rents were actually going to the Plaintiff legally. So the Receiver was appointed February 21st of this year. So there's a three-month period before that where we were not collecting rent where the Plaintiff was actually collecting rents, and received rents that should be provided as a credit because they applied it somehow prior to that January date.

THE COURT: They applied it to the operation of the property.

MR. SIEDMAN: They weren't operating the property then. That was -- so this is a period before the Receiver --

THE COURT: So your client's still operating it, but they're getting the rent.

MR. SIEDMAN: From December through February 21st, yes. Until the Receiver came in and took over operations, my

11

client was operating the property but did not have use of the rents via the assignment of rents.  So that --

THE COURT:  All right --

MR. SIEDMAN:  -- money should be accounted for, at a bare minimum --

THE COURT:  Assuming you have an equitable argument there that oh, by the way, Judge, somehow or another that needs to be accounted for, go back to the structure of the contract, right, and the remedy of the contract, and the Plaintiff position that, Judge, all of that sorting out comes at some future point.  For now, we have a contract, we have a remedy, we have a default.  The remedy is the face amount.  Again, leaving interest over here for the time being, we want the remedy the contract specifies.  What's your response to that formulation of the problem?

MR. SIEDMAN:  That we're talking, you know, an amount that's set as a judgment now.  So from an equitable argument, it's mostly equitable that from a fairness standpoint, the amount that should be set should be the correct amount, in essence.  We're going to be held to that.  That's the amount that we're trying to, you know, obtain to, in essence, satisfy the loan.

So before we are held to a higher number and have to then seek to reassess that damages, that number should get set now as an attainable number for us to seek to satisfy this

SAppx027

12

loan.

THE COURT:  All right.  I understand the parties' respective position as to the face amount of the judgment at this point.  Now let's go back to the interest issue, all right.

Let me hear from Plaintiff on interest.

MR. EPELBAUM:  Sure, Your Honor.

So, I mean, that's at least our perspective is a fairly straightforward issue.  As soon as there's an event of default, so there's a standard interest which, under the terms of the agreement is, I believe it's Wall Street prime plus 4-1/2 or 10-1/2, whichever's greater.  And then there's the default interest that automatically, under the terms of the loan agreement, kicks in as soon as an event of default.

Now, we are -- the reason we're here because there was an event of default.  So the entire time that we -- from when the event of default occurred to when we filed, and continues to accrue since then, is default interest of 25 percent.  It's just that -- those are the rights of the contract.  The receivership order specifically preserves those rights for the Plaintiff.  So that's why our position is it has accrued; it continues to accrue at the default interest of 25 percent.

THE COURT:  All right.  It's the written word followed by math.

13

MR. EPELBAUM:  Yes, Your Honor.

THE COURT:  Defense, I'll hear from you about interest.

MR. SIEDMAN:  So per our calculations, the unpaid principal of the complaint as of May 27th was 20 million, 500. We would agree that there's certain interest through May 27th, 2025, per the complaint, of 1.4 million.  They do include additional interest for June at some point.  But then there's a construction balance escrow which pretty much negates the interest that's being charged.

So at the end of the day, we could agree to that number at this point in time.  But we would still dispute that they're entitled to default interest, and also want to verify that there's no double-dipping of the interest from the contractual rate to the default interest, as it is very unclear from their declaration, you know, exactly how they came to those numbers.

THE COURT:  All right.  I haven't really studied the issue of the construction escrow balance.  So let me see what the Plaintiff has to say about that.

MR. EPELBAUM:  Your Honor, if I may just clarify a couple of issues.  So I think there's some confusion as to the timing of everything.  So in -- so we have the interest that was calculated in the complaint, as of the filing of the complaint.  And the complaint was filed on January 6, 2025.

SAppx029

14

So, and that's the -- that interest was provided and that's Paragraph 28 of the complaint. That is the interest at the time was 1.4 million, for all intents and purposes.

So, and then there's the period of time between filing of the complaint and filing of the request for the default judgment. That's where the additional interest accrues. Now, looking at the submission that was made for the Defendant, they seem to take the position that the complaint was filed on May 27th, 2025, which is not the case because that's the sort of -- they're ignoring the difference between the filing of the complaint and the filing of the default judgment.

THE COURT: All right.

MR. EPELBAUM: So I just wanted to clarify that to make sure it's clear where the numbers are coming from.

THE COURT: All right. Let's get back to the construction escrow.

MR. EPELBAUM: Sure. And that's all accounted for. If you -- the complaint accounts for that. So the calculations in the complaint, they take just under 1.5 as a construction escrow. It's backed out of the face amount of the loan. That's why we have -- because the face amount of the loan is 20-1/2 million. The accrued interest as of filing of the complaint is 1.4 million. And there are, at the time, fees and expenses of 41,000. And then the less construction escrow

15

balance of 1.49 million, that's backed out.  So we --

THE COURT:  So it's accounted for is what you say.

MR. EPELBAUM:  Yes.  Yes, it is.

THE COURT:  All right.

MR. EPELBAUM:  And in fact, it's also -- the calculations are also shown in the request for default judgment, which is also accounted for in that submission.

THE COURT:  All right.  Mr. Siedman, what's your reaction to that?

MR. SIEDMAN:  So our position would be that the interest should be as the complaint amount.  To the extent that, you know, it comes back to rent was received, it would have been applied to interest and expenses.  We would ask the court that at this point in time, that default be set at the complaint amount with the ability to -- for the Plaintiff to reassess damages going forward at a later point in time as to the post-complaint amount.

THE COURT:  Well, put that on the shelf.

MR. SIEDMAN:  Okay.

THE COURT:  In ECF 37-1, you're looking to back out, call it 1.5, for the construction escrow.  Counsel for Plaintiff says we backed that out, Judge.  We backed it out in the complaint and we backed it out in all of our filings since then.  It's accounted for.  And so if that's accurate, then we would not need to back it out again?

SAppx031

16

MR. SIEDMAN:  No.

THE COURT:  All right.

MR. SIEDMAN:  That would be -- I agree with that.

THE COURT:  All right.

MR. SIEDMAN:  Yes.

THE COURT:  Just wanted to make sure we have clarity.

MR. SIEDMAN:  Yes.

THE COURT:  All right.

MR. SIEDMAN:  As long as we're getting credit for it, I am good.

THE COURT:  Understood.  All right.  I understand the parties' position on the motion for judgment.  A judgment will be entered sooner rather than later.

MR. EPELBAUM:  Thank you, Your Honor.

THE COURT:  Let's move on to the motion for contempt. Mr. Quaglia?

MR. QUAGLIA:  Thank you, Your Honor.  Yes.  The Receiver has been constrained to file a contempt motion.  We did it reluctantly.  I do not generally file contempt motions. We try to avoid filing a contempt motion.

THE COURT:  I'm aware of that.

MR. QUAGLIA:  Okay.  So, but the issue is there is information that the Receiver needs that has not been produced. And we've been told by Mr. Pulley that well, I gave you what I have.  But there's information that has not been produced and

things that have not been done that are required to be produced and done, and that certainly should exist.

And just briefly running down of course, Your Honor, the first one of which is the accounting that was required by this Court now in two separate orders to be filed and served on the parties that will lay out from the most recent financials given to the Plaintiff to the date of the receivership what went on financially at the borrower in the properties, what money came in, what money went out, how it went out, who it came in from, et cetera.

We don't have that information. The Court's ordered the Defendant to produce it now two different times, once within 30 days, then within 5 days. It's not been produced. It hasn't been filed or served. And that seems like a pretty clear-cut example of contempt to me.

THE COURT:  Sure does.

MR. QUAGLIA:  Then there are a number of items that we've gone through. And Jonathan Lakner is here. We filed a reply declaration from him yesterday to clarify the issues. Obviously, he's available to answer any questions that the Court may have, or that Mr. Siedman or Mr. Yanoff may have. But we've run through the items, one, two, three, four, five, six items in his declaration that have not been produced.

For example, tenant ledgers. And a tenant ledger is for a particular tenant, what they've been charged, what

18

they've been paid.  That -- they have not been produced to us.  We've been given copies of I believe five of the leases which do have an amount.  We don't know if that amount's changed, evolved.  We don't know how much of it's been paid or not paid.  They haven't been produced.

Mr. Pulley says, well, I've given you what we have. But we don't understand how he could not have tenant ledgers. How else would anyone know what the tenant owes and what the tenant's paying.  That's one example.

You know, these CAM reconciliation calculations, so the common area maintenance is charged on an estimated basis to each tenant each year.  And then at the end of the year, what's been paid is compared to expenses actually incurred, and there's a true-up at the end.  And the Receiver needs that information because now it's their job to reconcile the CAM for 2024, and to know what's been paid, what the estimated payments were, how those numbers were derived, what the year-end numbers were, et cetera.

Again, they don't have that information.  And the response is well, we've given you what we have.  Well, how could there not be CAM calculations?  I mean, surely, someone was charging common area maintenance.  Someone was deciding how much was incurred.  There has to be some basis, some record of those calculations.  We haven't seen it.

And that's essentially the essence of these, each of

19

these six items we've got.  And then the final item just happened to come to light, coincidentally over the last week, when I got a call from Counsel for the School District of Jenkintown who said they're an intervenor in a pending tax appeal that's being pursued by the Defendant in Montgomery County.

Well, the Receiver under the receiver order is authorized to intervene or take control of any such tax appeals.  The Receiver was never informed that that appeal even existed and sort of -- well, gallingly, the Defendant filed a response to a motion to compel from the School District in which they literally blamed the Receiver for their inability to respond to say well, we can't possibly produce this information to the School District because the Receiver won't give it to us.  And we were not even aware that the appeal was pending.

So we've attached Mr. Lakner's declaration, copies of the request for production by the School District.  This is an item that the Receiver may or may not be taking over.  I don't know that that decision's been made.  We just learned about it, as I said.  But at a minimum, we're asking that Mr. Pulley produce to the Receiver, to be provided to the School District, the information that the School District is requesting in connection with these tax appeals.

And we'd like all these items.  Again, as Your Honor's aware, we're really not looking to be punitive.  We'd

20

really prefer not to have a contempt order issued or sanctions entered. But we just don't know what else we can do to get this information.

THE COURT: All right.

MR. YANOFF: Your Honor, if I may, if I can address the last issue first. The tax appeal was for tax appeal year 2024, which means it was filed in 2023. That matter lay dormant until about a month ago when the School District filed a motion to compel responses to discovery which I didn't answer essentially because we didn't have the authority to answer those things.

THE COURT: Did you give notice to Mr. Quaglia about the -- about the --

MR. YANOFF: Frankly, I'll follow my sort of -- I probably did not give notice. It probably didn't occur to me to give notice because nothing had happened in that case since the original filing in --

THE COURT: Well, when a motion occurs, something has happened.

MR. YANOFF: Well, the motion did occur. And my response to the School District was I don't have that information, so I can't give it to you. That's all that's occurred. There's been no prejudice to anybody. There's been no problems with that.

And I was unaware that the attorney for the School

21

District had contacted Mr. Quaglia.  But that's essentially what occurred here.

THE COURT:  But why does it matter whether that attorney contacted --

MR. YANOFF:  It really doesn't matter.  It really doesn't matter, Your Honor.

THE COURT:  No, it doesn't, Mr. Yanoff, because at the point in time where something did happen in the case, and particularly when a representation is being made that we, Jenkins, cannot comply with a request from a public entity for information and then blames the Receiver, I would certainly expect an officer of the court to communicate with Counsel for the receiver and say this event has now occurred, and it has implications for the property.  Understood?

MR. YANOFF:  I do understand, Your Honor.  And I apologize to the Court.  That was my error, not my client's error.  And I didn't notify them, and essentially because the case had gone nowhere except for the motion.

THE COURT:  So now we have a motion.  You've responded to the motion and said you can't provide the information.  But I hear from Mr. Quaglia, who by the way has represented many receivers before me in many cases and the first time I've ever seen him file a motion for contempt, saying Judge, we don't have basic information.

MR. YANOFF:  And, Your Honor, we don't have the basic

SAppx037

22

information.  My client has been requesting that basic

information since the appointment --

THE COURT:  From?

MR. YANOFF:  From Mr. Quaglia and from the Receiver

in order to provide the documents and the information that

they've requested.  And this -- Your Honor, this -- I'm sorry.

THE COURT:  What documents were turned over to the

Receiver?  According to the Receiver, fundamentally important

documents for the administration of a rental property were

never provided to them.  You've got to have tenant rent rolls.

You otherwise don't know if the tenants are paying the rent.

MR. YANOFF:  We provided the general ledger up to the

last time that we collected the rent.  The general ledger has

information about the payments by tenants in the general ledger

itself.  There's no way for us to know what the status of the

payment of rents would have been after the -- after the notice

received from the lender that they were then collecting rents,

and then thereafter when the receiver took over.  We would have

no way of knowing that information even though we've requested

it.

If we had that information, we would have provided

the ledgers.  That's not at issue.  But we didn't have that

information in order to give accurate and appropriate

accountings.

THE COURT:  I cannot fathom how you would not have

SAppx038

23

the information.

MR. YANOFF:  Your Honor, I have my client here who could testify to that if Your Honor requires testimony.  I could just tell you that that's the information that I have and that we provided all the information that we had up to the point of time that we no longer had that information, and we gave it to them.

THE COURT:  Let me talk to Mr. Lakner.

Mr. Lakner, no need to rise, sir.  You can stay seated.  What exactly was produced to you by Jenkins Realty after the entry of my receivership order?

MR. LAKNER:  I can --

THE COURT:  And if you need to consult documents, feel free.  I mean, it's not a memory quiz.  I'm trying to get my arms around exactly what information was made available for you to intelligently administer the property.

MR. LAKNER:  What did we get?

THE COURT:  Yes.

MR. LAKNER:  Well, we got a -- so when we take over the properties, we always provide the borrower a Dropbox and ask, will you please put everything in this Dropbox, dump everything in it.  They had provided a document dump of emails between the lender and the borrower.  It really didn't have any bearing on what we needed.  The information was also coming piecemeal in emails.

24

But what we did receive were some invoices, leases, really basic information, the information that we need in order to run with the property. We're stewards of the property, and we need basic information. We didn't receive a rent roll. The tenant ledgers we did not receive. We received a general ledger, but the general ledger just shows what the tenant paid. A tenant ledger will show what the tenant is billed monthly and what they're paid monthly.

So when we take over, we need to see a snapshot in time. Okay, as of this date, what has the tenant been paying? What has the tenant billed? What has the tenant not paid that they were billed? So while the ledger shows there were payments made, we don't know if the tenants had balances as of the date of the receivership that we need to go and collect.

So, and we also, that dovetails into the CAM recs. We didn't receive the CAM recs. The CAM recs -- the tenant ledgers will show what was billed as far as the CAM recs. There's an annual reconciliation where either a lump sum is due or credit is due to the tenants. That would show in the ledger.

The calculations, we need the CAM calculations. They say that 2022 was not available. They were destroyed in the flood. Fine. We need 2023. The 2023 calculations have base year information for taxes and for CAM that we need to use going forward for all the years, the subsequent years. We

SAppx040

don't know what the base years are, so we can't calculate the CAM for 2024.  We can't calculate estimates for 2025.

The rent rolls, we need a rent roll so we can determine what they were using as far as square footages going forward for all the tenants.  Even though that we have leases, they have to have a rent roll showing what the square footages of the vacant spaces were, what spaces were vacant upon takeover.  It's an easy ask.

And then there were some -- you know, we asked for information regarding the access system, the camera system for the building, basic information.  How does it function?  Is it web-based?  Is there a computer?  Is there a license for it?  What are the passwords?  So that we can do simply, you know, provide access cards to tenants, delete access cards that we need to.

We don't know anything about the access system, anything about the DVR or about the camera system.  We don't have access to it.  We just simply were trying to get that so that we can operate the property.  What else.

THE COURT:  As I understand it, financials, income and expense statements, were not supplied either.  Is that correct?

MR. LAKNER:  They provided certain months of 2023 and certain months of 2024, but not the full years.  Or, I'm sorry.  From August 23 to December 23, and then from April 24 through

26

December 24 were not provided.  Were not provided.  So we need the full year for 2024 so that we can, when we do get the CAM recs, generate the CAM recs for 2024.

THE COURT:  Give me some sense of the logistics of this, Mr. Lakner.  So is Trigild present on site?  Is there some representative?  Day-to-day, you've got a physical property.  What's going on?

MR. LAKNER:  Yes.  So we have Lincoln Property Management.  We engage them to manage the property.  There is a local property manager who tours the property every day, every few days.  We have a cleaning company on site with day porters.  And we are, you know, we're there.  We're affecting repairs to the HVAC, to the building in general, plumbing issues.  Anything that pops up, we're making repairs for.

THE COURT:  All right.  And these entities that are providing these services for Trigild, are they newly retained by Trigild, or are they holdovers from prior ownership?

MR. LAKNER:  New.  They are new --

THE COURT:  Newly retained.

MR. LAKNER:  Yes, sir.

THE COURT:  All right.  Mr. Yanoff, what is it that you would like to say, or have Mr. Pulley say, with respect to where we stand?

MR. YANOFF:  Essentially, Your Honor, what I've already indicated that we believe we've provided the

SAppx042

27

information that we have available to us to the Receiver.  On the issue of the access and security camera information, we've been frozen out of that system.  We have no ability to access as to get any information from it.  Somebody had disconnected us.  We don't know who that is.  We can't get into that system at all.

And with respect to the CAM reconciliations, we gave them the actual bills that were given to the tenants.  We gave them the physical bills that were given to the tenants, which is the information that's been requested.  Our position is just very simply that we're happy to give the information, provided we get some response from the Receivers as to what they've done since that time so we can complete our records accurately.

Giving inaccurate records really doesn't help anybody in this situation.  So we're willing to do that, but we need the information on what they've collected and what they've done.

THE COURT:  So you're saying you have information that hasn't been turned over?

MR. YANOFF:  No, no.  No.

THE COURT:  And you -- that's what I just heard you say.

MR. YANOFF:  We have incomplete information that we've given what we have.  That's what my client tells me, that we have given what we have.  But we don't have the

entireaccurate picture because of information that we're still lacking.

THE COURT:  I'm having a hard time following that, Mr. Yanoff.  I'm going to ask Mr. Pulley to take the stand, please.

MR. YANOFF:  Sure.

MR. PULLEY:  Good morning, Your Honor.

THE CLERK:  Please raise your right hand.

PHILIP PULLEY, COURT'S WITNESS, SWORN

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE CLERK:  And can you please state your name and spell your name for the record?

THE WITNESS:  Philip Pulley, P-U-L-L-E-Y.

THE CLERK:  Thank you.

THE COURT:  Mr. Yanoff, do you have any questions you want to ask Mr. Pulley before I ask him some questions?

MR. YANOFF:  Your Honor, I yield to the Court to get satisfied.

EXAMINATION

BY THE COURT:

Q    Mr. Pulley, at the time of the default, physically where were you operating your business from?

A    At the time of the default, we were operating at 610 Old York Road, Suite 375.

Q    So right at the property?

A    At the property.

Q    All right.  And with respect to the offices there, I take it that you have both paper and electronic records?

A    We do.

Q    All right.  And with respect to things like rent rolls, can you explain to me how you could possibly run a property like this and not have rent rolls for the tenants?

A    We have provided rent rolls back from the end of 2024. They were provided in a docu-dump, as they have mentioned, and that docu-dump occurred on March 10, 2025.

I have a list here of all of the items that were provided as part of that team's item.  They included all leases.  They included all amendments.  They included rent rolls.  They included permits.  They included notice of the appeal that was going on in the real estate taxes.

Trigild provided a two-page document that they had asked information on.  We had responded promptly back within a day to all of the items referenced there.  They asked about real estate taxes.  We settled on appeal.  So on March 10th, we dumped, Your Honor, 8,400 pages of documents in the teams.  We have a list here of everything we did, which included permits, approvals, plan specifications on the tenants.

It included all the leases.  It included all the amendments.  It included the insurance information.  And I

apologize, it included the requisitions that were provided both to and from with PSG.  We provided bills for vendors.  We provided information as to who the vendors were.  Like the camera system, it's proprietary.  It's owned by SBG.  SBG owns the system.

The minute the Receivers came in, they took over control of the management office downstairs, and they disconnected us. And we have no way to get into the system to retrieve anything back, okay.  So, and we have asked them to give us access, or who disconnected us can get it reconnected, both for the entry control system and the CCTV.

Q    Who is SBG?  Who owns SBG?

A    I own SBG Management Services of PA.

Q    So you own the system that's provided to the property?

A    Correct.

Q    So how is it that you can't provide them then with access?

A    Well, we no longer have access because they have disconnected us in the office.  To make it more interesting is the Receiver, Trigild, knows exactly who our vendor was, which is Linked Alarm, and they're using Linked Alarm on our residential properties in connection with the property.

When they originally took over the property, we had RW Electric, which did the fire alarm, did some data servicing the property.  They retained them as a vendor in the property to do fire alarms, and they didn't even ask RW about it, RW Electric,

about the system.

RW, as far as I know, is still a vendor to them, maintaining their fire alarm systems in the property. They can ask them. We told them this. We told them it's our system. You can hire us and we'd be more than happy to do it for you, but here's where it's from. And it's Linked Alarm that they're familiar with, they're using on other properties.

So they want to make this appearance that, oh, we're not providing. We told them it's Linked Alarm. They're using -- Trigild is using them on other properties of ours. So there shouldn't be any question as to the entry control or the CCTV. We've been locked out of the system the same way we've been locked out of the door. Okay.

They brought up the issue in regards to the fire alarm certifications in the property. That is an out and outright fabrication because they immediately, upon taking the property over, there was a lot of false alarms and trouble signals coming from the North Court. And that was because the contractor working for event space was just doing whatever he wanted to do.

We told them the system's in trouble, the system's in trouble, including sending emails to him. And I carbon-copied the world on the emails so that there was no misunderstanding. They had RW Electric come out, re-fix and re-set the fire alarm. Well, he's the vendor. Okay.

You know, we sent them a copy of the fire alarm cert we had for the property. We also told them they can get another copy from RW Electric. Or, it's a matter of public record in the borough. So these things were out there. And that was part of the docu-dump on March 10th. As I said, March 10th included 8,400 documents. It was 8,400 pages and 280 documents.

Q   That may or may not help me, Mr. Pulley. Do you still physically maintain space in the building?

A   Yes, we do.

Q   And do you have an access card?

A   We do.

Q   Does it work?

A   Yes.

Q   Whose is it? I mean, what system is it?

A   Well, it's the one in the building. But we have no way to add, delete, change or anything in the building. Even they came to us and said hey, we want to change the hours of operation in the building to lock and unlock the doors. We said we don't have access to it. You locked us out. And then I also said to them, be careful because in certain leases require certain hours of operation. And that's because of things regarding Bethany Christian.

Q   So you still have a company that's providing the system, and you have an access card, and you can get in and you can get

out. But you're saying that you're helpless to assist Trigild in doing the things that they think they need to do to administer the property.

A    Yeah, because they have disconnected us. There's no way we can add, delete, change times or make any modifications to the system because the system is literally just doing its thing.

Q    In the physical space that you maintained at the property, Mr. Pulley, do you have paper files that pertain to the property?

A    Yes, we do.

Q    All right. And they're there. They're intact.

A    Yes, they are.

Q    And so Trigild could go in and Trigild could inspect those files, right?

A    Yes. And we've provided to them copies of everything that they have asked for in their request from the end of February. They sent us a detailed request. We've given them everything and said here it is.

Q    And they say not really, so that's where we are.

A    I understand that, Your Honor, but I take exception with their comments.

Q    All right. Is there anything else you want to add, Mr. Pulley?

A    Throughout the time frame and even as recently as the

SAppx049

P. PULLEY-EXAMINATION BY THE COURT

other day, we continue to forward all information, documentation to Trigild.  You know, we had the original items that we put in March 10th, and I can show you the ledger that we continue to provide them.  And this ledger only goes up to June 3rd.  Information, bills, and everything from any vendors or any information regarding the property.

In regards to the taxes, and I don't understand why it's become this great thing, the property has been posted for lien for failure to pay taxes by Trigild or the Plaintiff.  And the city has filed a notice of claim against the property, which was posted on all the doors around the building.

So, I mean, I'm somewhat taken back the fact that the taxes seem to become a surprise when the -- you know, in I think it was September of 2024, there was $65,000 sitting in an account for the real estate taxes.  And I know we're talking about the information and the accounting, but nowhere have they ever accounted for that $65,000.

And, you know, when it comes to the accounting, things seem to be a mystery to us.  We have been provided a copy of Trigild's report from February 21st until April 30th.  Okay. Very confusing to us.  According to their report in April, only three tenants out of 15 paid rent in the complex.  Somewhere, there's several hundred thousand dollars a month that are unaccounted for.

If they took over in February, just based on who pays rent

P. PULLEY-EXAMINATION BY THE COURT

at the end of February, there should have been $85,000 accounted for. There's no accounting for February since Your Honor said hey, you're now the Receiver. March, they collected no rents in the property other than $193,000 from Jersey College. Jersey College's money was January, February, March. They got caught. They were escrowing the money with their Counsel.

So there were no rents collected at all in March, and only three tenants paid rent in April. And we're sitting back, and this is one of the reasons why we're saying I don't understand the numbers because to us, there's a million dollars or more than a million dollars that has been unaccounted for. And if Trigild only collected three tenants' rents in April, then the problem is, why didn't they do it?

Q    Mr. Pulley, the three months that you say Jersey College was in arrears, how was that recorded? In other words, how would you or now Trigild have a record of the fact that they were in arrears? Or is that just something that you were carrying around in memory?

A    No.  It actually came from their report. I saw their report where Jersey College deposited $193,000 in March. That was the only rent, according to their reporting, that was collected in March.

Q    But was there a rent roll that would have shown that?

A    Once they began to collect the rents, we did not maintain

a rent roll because we didn't have any information as to who paid what.  In the beginning of January --

Q    You didn't have any rent roll for any tenant in the property?

A    No.  We had a rent roll when -- basically the last one that we gave them, which was part of the March 10th information, which was prior to the end of 2024.  Once the Plaintiffs started to collect rents in December 2024, we had no information.

We asked everybody for information beginning January 2024, not only because of our refinance efforts, it was also so that we could comply and we knew what was going on.  To this day, despite more than 12 requests of the Receiver and their Counsel, we keep asking for information.  Did you modify the leases?  Did you change the leases?  Are there any rent abatements?  Are there any addendums --

THE COURT:  The Receivers are reporting to the Court, and they're reporting to the Court based upon the information they have, which they claim has not been adequate for them to do the job that they want to do.  So, all right.  I think I have a picture here.

I'm going to ask Mr. Lakner to take the stand, please.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

THE CLERK:  Raise your right hand.

J. LANKER-EXAMINATION BY THE COURT

JONATHAN LAKNER, COURT'S WITNESS, SWORN

THE CLERK:  Please be seated.  Can you please state your name and spell your name for the record?

THE WITNESS:  John J-O-N; Lakner, L-A-K-N-E-R.

EXAMINATION

BY THE COURT:

Q    Mr. Lakner, have you yet had physical access to the records of Jenkins at the -- I mean, whatever paper records may exist, have you yet had access to those?

A    Any paper records that are kept on site?

Q    Yes.

A    No.

Q    All right.  Would that potentially be useful to you?

A    It would be useful if what we need is --

Q    Is there.

A    Is there in paper.

Q    We've heard some discussion here about the security system.  And apparently, Mr. Pulley's company owns the system. And he's told us that in some way they're locked out.  Can you shed any light on that for me?

A    No.  I don't -- I can't comment on that.  I don't know anything about it being disconnected.  We haven't disconnected any lines for the building.

Q    All right.  Mr. Pulley made a number of other points about the collection of rent.  Have you been collecting rent from the

SAppx053

tenants?

A   We have been collecting rents from the tenants.  When we took over the property, the rents were going directly to the lender, so we were not collecting them.  We noticed the tenants to start sending the Receiver the monies, the rent payments.  And so that has transpired over the past few months.

Q   And are you now trying to construct rent rolls for the different tenants, or I mean, is the management issue lacking some of these background records?

A   We are -- yeah.  We have -- the rent roll we have not received.  We have not seen a rent roll.  From the date that we took over, I haven't seen one.  And as far as the tenant that you're asking about, the tenant ledgers --

Q   Well, are you trying to construct records now?  I'm going forward.

A   Yes.  We're trying to construct records.  We're trying to construct what's supposed to be billed.  We don't know what is supposed to be billed other than base rent, that being CAM and taxes.  We don't know what's supposed to be billed because we don't have the CAM reconciliations, and we don't have the tenant ledgers which would show what was being billed prior to the receivership.

Q   And so you're saying that that's putting you at a disadvantage in terms of then assessing the tenants, what is it they owe?

39

A    Yes.

Q    All right.  Anything else that you would like to say in response to what we've heard from Mr. Pulley?

A    No.

THE COURT:  All right.  Thank you, sir.  You may sit down.

I mean, obviously, Mr. Yanoff, I'm very concerned about the situation that I confront here.  I mean, it seems to me that fundamental records are unaccounted for.  With respect to the 8,400 document -- well, I guess it was 280 documents and 8,400 pages, to be more precise, that Mr. Pulley has mentioned, are they all on the record somewhere?

MR. YANOFF:  I don't know that.  Are they on the record?

UNIDENTIFIED SPEAKER:  Yes.  They're all on Teams.

MR. YANOFF:  No.  You mean the record of the Court, Your Honor?

THE COURT:  Yes, sir.

MR. YANOFF:  No, they're not.

MR. SIEDMAN:  Your Honor, in Exhibit B --

MR. YANOFF:  I'm sorry.

MR. SIEDMAN:  -- to the response to the motion for contempt included a printout of the documents that were submitted via Teams.

THE COURT:  But not all 8,400, I assume.

SAppx055

40

MR. SIEDMAN:  Two hundred and eighty -- a list of the PDFs.

THE COURT:  The list of the PDFs.

MR. SIEDMAN:  Yes.

THE COURT:  All right.

MR. SIEDMAN:  It was supplemented to Mr. Pulley's declaration.

THE COURT:  All right.  Thank you, sir.

MR. YANOFF:  Thank you.

THE COURT:  All right.  I'm going to ponder further what the appropriate remedy here is.  But I will tell Mr. Pulley, tell his Counsel, that I'm very concerned by the state of affairs that we're looking at here.

So I'll turn to the third remaining item, and that is modification of leases.  I'll hear from the Receiver.

MR. QUAGLIA:  Yes, Your Honor.  Thank you.

So there's been some talk about tenants and paying rent, but there are at least two tenants who are not paying rent, have not paid any rent to the Receiver.  One is SBG Management, Mr. Pulley's company, which is on site.  And another is a company called Jenkins Storage, which is also owned -- under control by Mr. Pulley.

Jenkins Storage, in particular, occupies the entire bottom level of the property where they run a self-storage facility that, according to the information that we've seen, is quite

SAppx056

profitable.  Brings in several hundred thousand dollars of net income a year.

THE COURT:  Essentially three years.

MR. QUAGLIA: Right.  Correct.  Correct.  By which point, God willing, this will all be over.  So we're essentially in a situation where, notwithstanding the receiver order, Mr. Pulley remains in de facto control of a significant portion of the property.  He is collecting, or his entity is collecting, hundreds of thousands of dollars in rents.  He's paying no rent to the Receiver, and the Receiver is, under the current state of affairs, powerless to do anything about it other than to say, okay.

The arguments we got back from the defense to our motion were two, the first of which was essentially a due process argument.  We didn't notice the tenants.  We didn't notify the tenants of the motion.  Well, SBG Management is Mr. Pulley's company, and we submit that there would be no one else to notice but Mr. Pulley.  Jenkins Storage does not have an address, the same address as the Defendant, but their

42

contact person is Mr. Yanoff.  So we submit that the due process argument is dead in the water.

The secondary argument is essentially that the Plaintiff failed to take issue with these provisions when they made the loan and entered into subordination, non-disturbance, and attorney agreements.  I think the issue there is that the Receiver is conflating the Plaintiff, I'm sorry, the Defendant -- the borrower is conflating the Receiver with the Plaintiff, with the lender.

We are not the lender's successor.  We are not the lender's agent.  We're an arm of the Court.  We've got a fiduciary obligation to run the property in an economic fashion, to collect the rents.  We have power under the receiver order to modify contracts.

This Court has explicit authority in addition to its general authority to act in this instance, and we're respectfully submitting we're not asking Your Honor to evict anyone or take any steps like that.  We just want to modify the cure notice provision from 1,000 days to the more conventional 10 days, which will enable the Receiver either to collect the rents that are owed under the leases or to undertake remedies to evict the tenants.

THE COURT:  I assume you're using the 10-day benchmark as a convention of most commercial leases.  Is that right?

43

MR. QUAGLIA:  That is correct, Your Honor.

THE COURT:  And are the leases with the other tenants at the property, do they conform to that convention, if you know?

UNIDENTIFIED SPEAKER:  I believe so, yes.

THE COURT:  All right.  Thank you.  Mr. Yanoff, Mr. Yanoff?

MR. YANOFF:  Yes, Your Honor.  I think, quite frankly, to indicate that point of contact for Jenkins Storage is me merely because I represented Jenkins Storage at some point is somewhat disingenuous.  I don't represent them in this manner, and I think that notice, any kind of notice to me is not notice to the tenant.

And I think there is a due process requirement for them to at least notify those tenants that they seek to modify the leases for, not --

THE COURT:  Is Jenkins Storage Mr. Pulley's company?

MR. YANOFF:  It is a separate entity, Your Honor, a separately incorporated entity.

THE COURT:  I get that.  Does he own it?

MR. YANOFF:  Does he own it?  It's owned by Jenkins.  It's owned by a separate entity.  He does not own that company.

THE COURT:  What entity is it owned by?

MR. YANOFF:  I'm sorry?

THE COURT:  What entity is it owned by?  What's the

44

name of the entity that owns it?

MR. YANOFF:  Yeah.  It's owned by a gentleman by the name of Warren Silverman, not by Mr. Pulley.  The mere fact that it's located in the same building doesn't answer the question, Your Honor.  And if I may, going forward, I also think it's somewhat disingenuous for the Receiver to say well, we're not necessarily bound by agreements that were previously made by the lender.

And there was a subordination, non-disturbance, and attornment agreement entered into by the lender in which the lender agreed to be bound by the terms of all leases.  So they're cherry-picking one particular provision of that lease.  They agreed to be bound by that lease.

THE COURT:  Well, as Mr. Quaglia points out, they work for me.

MR. YANOFF:  No, no, no.  And I'm not --

THE COURT:  They do not stand in the shoes of the lender.  They represent the Court and the Court's administration of justice.

MR. YANOFF:  And I understand that, Your Honor.

THE COURT:  Mr. Pulley, I'm not going to put you back on the stand, but I'm going to engage in a colloquy with you still under oath, and that is you say Mr. Warren Silverman is the owner of Jenkins Storage?

MR. PULLEY:  Yes, Your Honor.  That's correct.

45

THE COURT: What interest do you have?

MR. PULLEY: I have no interest.

THE COURT: All right. What --

MR. PULLEY: Other than we rent its space. And keeping in mind there's a difference between an ownership interest and other business relationships, are you deriving income from Jenkins Storage?

MR. PULLEY: No. Typically it was just a regular landlord/tenant type relationship. During construction of the garage, the rent was dramatically reduced because of the loss of a whole bunch of self storage facilities. So the rent was brought down to $23,000 a month from the lease. That was documented. That was provided to the Plaintiffs in that connection, which all ties back to the garage.

I know now, because I've seen him at the facility, his business has suffered greatly because the garage is not done. The garage is still under construction. The water pours through the expansion joint. He's susceptible to constant flooding in both the Outback Steakhouse space and also Jersey College because they're not maintaining certain plumbing things at the building. The system is overflowing.

So his business has been greatly reduced. We had an opportunity in which to sell the self storage, which is where they're making reference to the potential income from it. So we entered into an accord with Mr. Silverman to say, hey, we

SAppx061

46

could potentially sell this.  You could have money.  You could move on.  We could pay down the debt at the property and the like.  We had a buyer for $4 million for the self storage.  Mr. Silverman had agreed to it with a separate understanding.

And because of no response by the Plaintiffs on two different occasions, we lost prospective buyers.  That would have given us an opportunity to pay the loan down of the building by millions.  Depending upon how you look at it, it could be anywhere between 2 and $4 million, depending upon reserves being set aside.  But as of today in self storage, water pours through it on a daily basis as it does in the garage.

THE COURT:  You made reference to the lender.  So you're talking now about Mr. Epelbaum's client, not the Receiver.  And --

MR. PULLEY:  I'm talking about PSG, ICON PSG.

THE COURT:  All right.

MR. PULLEY:  I'm sorry.

THE COURT:  So I'm going to turn to Mr. Epelbaum and say what light, if any, can you shed on whether or not your client was approached with respect to a deal involving this space?

MR. EPELBAUM:  So, Your Honor, obviously I can't testify to that because I don't really have knowledge for that.  And from our perspective, I don't think it really matters for

47

the purpose of why we're here.  Again, it's not our motion. It's the Receiver's motion.

But to the one clarity that -- I'm just looking at the documents -- can at least provide is that it does appear that the signature for landlord and for tenant for Jenkins Storage LLC does appear to be Mr. Pulley's.  So I can't speak to any issues with respect to the sale of refinance, other than the fact that that's outside of why we're -- outside the scope of this foreclosure in general, and --

THE COURT:  I'm just wondering if factually you could shed any light on what was represented to the Court.  That's all.

MR. EPELBAUM:  I cannot, Your Honor.

THE COURT:  All right.  I understand.

MR. EPELBAUM:  If you'd like my witness to provide any information to the extent he does, I'm sure he'd be happy to.

THE COURT:  Mr. Lawson, is it?

MR. LAWSON:  Yes, sir.

THE COURT:  Do you have any knowledge about this aspect of the case?

MR. LAWSON:  I know for sure there were emails exchanged between colleagues of mine at PSG and Mr. Pulley with regard to the potential to sell the storage space.  I personally serve in a capacity where this file isn't mine

SAppx063

48

alone, so I was on those emails that wasn't directly corresponding. But I can at least attest that, yes, there was emails regarding an interest in selling the space and potential sales price offers. But that's about the extent of which I know the specifics.

THE COURT: So, Mr. Pulley, what's the business address of Jenkins Storage?

MR. PULLEY: I believe it's -- they use the facility and -- I'm not sure of the other addresses. It's, I think, Norristown, East Norriton or something like that. But he has an office, Warren Silverman has an office in the facility.

THE COURT: You mean on Old York Road?

MR. PULLEY: Yes, in the lower level.

THE COURT: And how is it that your name was on the lease for both landlord and tenant if it's Mr. Silverman's company and Mr. Silverman's space?

MR. PULLEY: I don't know, Your Honor, unless I signed it in the wrong place or something. And I'm looking at Mr. Epelbaum has  -- it looks like it's signed with a yellow crayon. So I don't know what happened or didn't happen unless I can look at the document closer. But I do know it's owned by Mr. Silverman.

We have been involved in in-depth litigation in regards to Jenkins Court with a, I'm going to call it a slip and fall, where there was an alleged accident that occurred

49

there.  And Mr. Silverman went to court, represented, gave deposition and so forth as part of the discovery with the accident with this J.P. Mascaro trash company.  And that's where the person got hurt from.  So, I mean, I don't know.

THE COURT:  I assume there's insurance?

MR. PULLEY:  Unfortunately, there's a gap in insurance in that regard with Jenkins Storage.  The base building ended up -- and Mr. Yanoff represented us in that matter, as well as the insurance companies that then walked away.  But that matter was settled with the employee of J.P. Mascaro.

THE COURT:  Thank you, sir.

Mr. Quaglia, anything else from --

MR. QUAGLIA:  Just, Your Honor, I would note that, yes, we're -- and this is in the record.  It was -- this version is from Document 32-4.  The signature page for the Jenkins Storage lease lists landlord by Philip Pulley, and that appears to be the highlighter signature.  And then below that is tenant, Jenkins Storage LLC, with an ink signature that, I'm not a handwriting analysis, but certainly appears to me, based on the other documents in the record, to be Mr. Pulley's signature.

There's also another signature for the tenant by a Lisa Malk (phonetic) president.  There's no signature by Mr. Silverman.  And I had alluded to this before, but since

50

Your Honor asked the question specifically, the address for -- the most recent sort of official address we have for Jenkins Storage, which is from this subordination, non-disturbance, and attornment agreement that was recorded in October of 2023 in the record is Document 34-7, lists the address as Jenkins Storage LLC, 610 Old York Road, G-100, Jenkintown, PA 194046. Attention, Michael Yanoff, Esquire.

THE COURT:  All right.  Thank you, Mr. Quaglia.

Defense, anything else you'd like to say before we adjourn?

MR. YANOFF:  No, Your Honor.  Thank you.

THE COURT:  All right.  Lender?

MR. EPELBAUM:  No, Your Honor.  Thank you.

THE COURT:  All right.  I'll take this under advisement.

MR. YANOFF:  Thank you, Your Honor.

MR. EPELBAUM:  Thank you, Your Honor.

THE CLERK:  All rise.

(Proceedings adjourned at 11:09 a.m.)

CERTIFICATION

I, **Mary E. Dring**, court approved transcriber, certify that the forgoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*/s/ Mary E. Dring*                    *07/9/2025*